PEOPLE v CHAMPION

Docket No. 100138. Argued October 11, 1995 (Calendar No. 5). Decided
July 2, 1996.

Kenneth R. Champion was convicted by a jury in the Saginaw Circuit
Court, Leopold P. Borrello, J., of possession of less than twenty-five
grams of cocaine. Thereafter, he pleaded guilty of being an habitual
offender, fourth offense. The Court of Appeals, McDONALD, P.J., and
SAWYER and MARILYN KELLY, JJ., reversed, finding that the trial court
erred in failing to suppress evidence of the cocaine on the ground
that the officers did not have probable cause to arrest when they
conducted a patdown search, and thus the further search of the
defendant was not authorized as a search incident to arrest and
was not permissible under the plain feel doctrine of *Minnesota v
Dickerson*, 508 US 366 (1993) (Docket No. 132469). The people
appeal.

In an opinion by Justice MALLETT, joined by Justices BOYLE, RILEY,
and WEAVER, the Supreme Court *held*:

Cocaine found in a pill bottle in the defendant's sweatpants fol-
lowing the patdown search was properly seized when viewed under
the totality of the circumstances.

1. A police officer may make a valid investigatory stop if the
officer has a reasonable suspicion of criminal activity, justified
under the totality of the circumstances by a particularized and
objective basis for the suspicion. An officer who makes such a stop
may perform a limited patdown search for weapons if there is a
reasonable suspicion that the individual is armed and poses a dan-
ger to the officer. Further, an officer may seize without a warrant
an object felt during a legitimate patdown search when the identity
of the object is immediately apparent and the officer has probable
cause to believe that the object is contraband, i.e., if the officer
develops probable cause to believe that the item felt is contraband
before going beyond the legitimate scope of the patdown search.

2. In this case, the Court of Appeals failed to apply the probable
cause standard. Instead, it required a degree of suspicion that
approached near certainty. Under the totality of the circumstances,
however, the officer, upon feeling a pill bottle, had probable cause
to believe that it contained contraband: the defendant displayed

furtive behavior, the officer recognized the defendant and knew of his previous drug and weapons convictions, the officers were in a high drug crime area, the defendant refused to remove his hands from his sweatpants when asked, and the officer, on the basis of experience, knew that controlled substances often were carried in the type of pill bottle discovered during the patdown search. Because the patdown was authorized, and it was immediately apparent during the patdown that there was probable cause that the object felt contained contraband, the plain feel exception to the warrant requirement authorized removal of the pill bottle from the defendant's sweatpants.

3. A search of a person incident to an arrest requires no additional justification and extends to the opening of containers found within the control area of the arrestee. A search conducted immediately before an arrest may be justified if there is probable cause to arrest the suspect; however, a search of a container cannot be justified as being incident to an arrest if probable cause for the contemporaneous arrest was provided by the fruits of that search. In this case, the officer had probable cause to arrest before he opened the pill bottle. Because the bottle was in the control area of the defendant when seized, its opening was authorized as a search incident to arrest.

Reversed.

Chief Justice BRICKLEY, joined by Justices LEVIN and CAVANAGH, dissenting, stated that *Terry v Ohio*, 392 US 1 (1968), specifically forbids the type of seizure conducted in this case. The majority misapplies *Dickerson*. To the extent *Dickerson* departs from *Terry*'s strict prohibitions, it allows admission of nonweapons evidence found during a patdown if, but only if, the officers conducting the patdown have probable cause to believe that the item felt is contraband. The item felt in this case, a pill bottle, while containing contraband was not, in and of itself, contraband. Accordingly, it was impossible for the officer to have probable cause to believe otherwise, and its seizure was illegal. Because the record is completely devoid of credible evidence that would provide an alternate basis for the officer's actions, the evidence should be excluded.

205 Mich App 623; 518 NW2d 518 (1994) reversed.

*Frank J. Kelley*, Attorney General, *Michael D. Thomas*, Prosecuting Attorney, and *Janet M. Boes*, *Edwin R. Brown*, and *Catherine Semel*, Assistant Attorneys General, for the people.

*Daniel D. Bremer* for the defendant.

Amicus Curiae:

*Donald Martin,* President, *John D. O'Hair,* Prosecuting Attorney, and *Timothy A. Baughman,* Chief, Research, Training and Appeals, for the Prosecuting Attorneys Association of Michigan.

MALLETT, J. In this case, we consider for the first time the "plain feel" exception to the warrant requirement as adopted by the United States Supreme Court in *Minnesota v Dickerson,* 508 US 366; 113 S Ct 2130; 124 L Ed 2d 334 (1993). In particular, this case requires us to articulate the degree of certainty required that an object felt during a patdown search is contraband before a police officer may remove that object from the person being searched. We disagree with the Court of Appeals holding that *Dickerson* requires a level of suspicion approaching near certainty. Therefore, we reverse that Court's holding that cocaine found in a pill bottle on the defendant's person during a patdown search was inadmissible.

I

FACTS

On the evening of April 9, 1990, two uniformed Saginaw police officers were patrolling near North Fourth and Kirk Streets, an area known to them as a high drug crime area, when they saw a man begin to run upon seeing their marked patrol car, and disappear around a corner. As the officers turned their patrol car around the same corner, the man veered off behind a store. The officers then observed two other men who, appearing to sight the patrol car, got out of their car that was parked midblock. The pas-

senger ran from the scene, while the driver began walking away from the car with his hands tucked inside the front of his sweatpants.

The officers parked diagonally in front of the vehicle. Officer John Todd, a twenty-year veteran of the Saginaw police force, recognized the driver as defendant Kenneth Ray Champion from previous drug and weapons arrests. Officer Todd knew that Mr. Champion had a prison record.

The officers briefly chased after Mr. Champion while ordering him to stop and to remove his hands from his sweatpants. They gave these orders at least two and possibly three or four times. Mr. Champion did not comply until the officers had caught up to him. Officer Todd then conducted a patdown search for weapons. He felt what he immediately identified as a pill bottle tucked inside Mr. Champion's sweatpants, between his legs in the groin region. From his law enforcement experience with drugs, Officer Todd testified that he knew that controlled substances were often carried in such pill bottles. Believing that the pill bottle contained contraband, specifically controlled substances, Officer Todd removed it, opened it, and found that it contained cocaine.[1]

The officers placed Mr. Champion under arrest and further searched him. They seized $584.23 from his right pants pocket, and $14 and a pager from his left pants pocket. When the officers conducted an inven-

---

[1] The brown, plastic pill bottle contained a white powder, that upon subsequent testing was found to be cocaine.

tory search of the car, they found three packets of cocaine in the false bottom of a can of Fix-a-Flat.[2]

Defendant moved to suppress the physical evidence before trial and again midway through trial, arguing that the cocaine found in the pill bottle and in the can of Fix-a-Flat had been improperly seized. Both times the trial court ruled that, on the basis of the totality of the circumstances, the challenged evidence was admissible.

A jury convicted defendant of possession of less than twenty-five grams of cocaine. MCL 333.7403 (2)(a)(v); MSA 14.15(7403)(2)(a)(v). He then pleaded guilty of being an habitual offender, fourth offense. MCL 769.12; MSA 28.1084. The trial court sentenced him to five to fifteen years in prison.

The Court of Appeals reversed on the basis that the trial court erred in failing to suppress the cocaine found in the pill bottle in the defendant's sweatpants. While finding the investigatory stop reasonable under *Terry v Ohio*, 392 US 1; 88 S Ct 1868; 20 L Ed 2d 889 (1968), the Court found that the officers did not have probable cause to arrest when they felt the pill bottle during the patdown search. Thus, removing and opening the pill bottle was not authorized as a search incident to arrest. Further, the Court found that because it could not have been "immediately apparent" to

---

[2] These facts are primarily drawn from the trial court's findings at the midtrial suppression hearing. At that hearing, the trial court found Officer Todd's testimony to be less credible than the testimony of his rookie partner, Officer Vern Chontos. The two officers gave a somewhat different version of events. Their accounts differed in how the patrol car was parked, how the officers chased and approached Mr. Champion, and the direction Mr. Champion walked after leaving the car. These differences led the trial court to find that the officers seized Mr. Champion at an earlier point than the court first determined at the pretrial hearing. These differences are not crucial to our analysis.

Officer Todd that the pill bottle found in defendant's groin region was contraband, removing and opening the pill bottle was not permissible under the "plain feel" doctrine as articulated by the United States Supreme Court in *Minnesota v Dickerson, supra*. The Court further held that the cocaine found in the can of Fix-a-Flat was improperly seized because, lacking probable cause to arrest, the inventory search of the automobile was improper. 205 Mich App 623, 631; 518 NW2d 518 (1994).

II

DISCUSSION

The Fourth Amendment of the United States Constitution and the analogous provision in Michigan's Constitution guarantee the right of the people to be free from unreasonable searches and seizures.[3]

---

[3] The Fourth Amendment provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . . [US Const, Am IV.]

Michigan's analogous provision states:

The person, houses, papers and possessions of every person shall be secure from unreasonable searches and seizures. No warrant to search any place or to seize any person or things shall issue without describing them, nor without probable cause, supported by oath or affirmation. *The provisions of this section shall not be construed to bar from evidence in any criminal proceeding any narcotic drug, firearm, bomb, explosive or any other dangerous weapon, seized by a peace officer outside the curtilage of any dwelling house in this state.* [Const 1963, art 1, § 11 (emphasis added).]

This Court, in *People v Nash*, 418 Mich 196; 341 NW2d 439 (1983), explained that the antiexclusionary provision in Const 1963, art 1, § 11, emphasized above, does not necessarily preclude this Court from developing evolving standards of reasonableness. *Nash* further explained, however, that the history and plain import of the provision suggest that the

Searches and seizures conducted without a warrant are unreasonable per se, subject to several specifically established and well-delineated exceptions. *Katz v United States*, 389 US 347, 357; 88 S Ct 507; 19 L Ed 2d 576 (1967). The United States Supreme Court has carved out these exceptions by balancing an individual's privacy interests against the government's interests in the given circumstances. Three exceptions to the warrant requirement are relevant to our review in the present case. Each will be discussed in turn.

A

STOP AND FRISK

Police officers may make a valid investigatory stop if they possess "reasonable suspicion" that crime is afoot. *Terry v Ohio, supra.* Reasonable suspicion entails something more than an inchoate or unparticularized suspicion or "hunch," but less than the level of suspicion required for probable cause. *United States v Sokolow*, 490 US 1; 109 S Ct 1581; 104 L Ed 2d 1 (1989).

A valid investigatory stop must be justified at its inception and must be reasonably related in scope to the circumstances that justified interference by the police with a person's security. Justification must be based on an objective manifestation that the person stopped was or was about to be engaged in criminal activity as judged by those versed in the field of law enforcement when viewed under the totality of the circumstances. The detaining officer must have had a

Michigan Constitution should not be construed to provide greater remedy for search and seizure violations than the federal constitution unless there is a compelling reason to do so. See also *Sitz v Dep't of State Police*, 443 Mich 744; 506 NW2d 209 (1993).

particularized and objective basis for the suspicion of criminal activity. *People v Shabaz*, 424 Mich 42; 378 NW2d 451 (1985).

An officer who makes a valid investigatory stop may perform a limited patdown search for weapons if the officer has reasonable suspicion that the individual stopped for questioning is armed and thus poses a danger to the officer. *Terry, supra. Terry* strictly limits the permissible scope of a patdown search to that reasonably designed to discover guns, knives, clubs, or other hidden instruments that could be used to assault an officer. *Adams v Williams*, 407 US 143, 146; 92 S Ct 1921; 32 L Ed 2d 612 (1972).

Defendant Champion does not challenge his initial detention or patdown search. Without belaboring the issue, we agree with the Court of Appeals ruling that an investigative stop and patdown search for weapons was reasonable under the totality of the circumstances.[4]

> Particularized suspicion arose as a result of the following factors: (1) the area was a known drug crime area, (2) a man, seeing a marked police car, ran from sight around a corner, (3) as officers turned the corner, two men got out of a car parked midblock, (4) the passenger and the man at the corner ran away, (5) the driver made some movement away from the car, (6) he was known by the police to have previous drug and weapons convictions, (7) he held his hands inside the front of his sweatpants, and (8) he refused

---

[4] Contrary to the dissent's assertion, we do not "[w]ithout analysis . . . announce[ ] that the investigative stop was supported by a 'reasonable particularized suspicion.'" *Post* at 121, n 3. Rather, we agree with the Court of Appeals finding and analysis that there was reasonable particularized suspicion for the stop based on the totality of the circumstances.

several police orders to remove his hands from his sweatpants.

Defendant's behavior created a reasonable, articulable suspicion to permit a police officer to stop and investigate. Consequently, a patdown search for weapons was also permitted. See also *Minnesota v Dickerson*, 508 US 366; 113 S Ct 2130; 124 L Ed 2d 334 (1993); *People v Nelson*, 443 Mich 626, 639; 505 NW2d 266 (1993). [205 Mich App 628.]

Having concluded that the stop and frisk were reasonable, we are compelled by the dissent to point out that this is not the controlling issue. We did not grant leave in this case to hear again the relative merits of the *Terry* doctrine. As we have already noted, defendant conceded that the initial stop and frisk were reasonable. The only relevance *Terry* has to the outcome of this case is to whether the frisk of defendant exceeded that necessary to discover the existence of a weapon. We explain later that it did not. The dissent's focus on *Terry* and its progeny, however, goes far beyond this narrow issue.[5]

B

PLAIN FEEL

The plain feel exception to the warrant requirement adopted by the United States Supreme Court in *Minnesota v Dickerson, supra,* allows the seizure without

---

[5] A significant portion of the dissent concerns the propriety of the *Terry* doctrine as argument against the adoption of the plain feel exception. The dissent's tired and almost shrill insistence that *Terry's* "evils" should somehow dictate our decisions whether to adopt the plain feel doctrine is misplaced. Its litany of the parade of horribles possible under *Terry* detracts from the proper focus on the plain feel doctrine as a separate justification for seizure of contraband felt during an authorized patdown. The dissent's focus on *Terry* in this regard is also curious in light of its author's previous opinion in *People v Nelson, supra,* which upheld the legitimacy of a *Terry* stop in part on the basis of the modes and patterns of behavior of certain kinds of lawbreakers.

a warrant of an object felt during a legitimate patdown search for weapons when the *identity of the object is immediately apparent and the officer has probable cause to believe that the object is contraband*. In adopting the plain feel exception, the Court in *Dickerson* analogized to the plain view doctrine. To understand the plain feel exception to the warrant requirement, it is necessary to first understand the plain view doctrine.

1

PLAIN VIEW

The plain view doctrine allows police officers to seize, without a warrant, items in plain view if the officers are lawfully in a position from which they view the item, and if the item's incriminating character is immediately apparent. *Horton v California*, 496 US 128; 110 S Ct 2301; 110 L Ed 2d 112 (1990);[6] *People v Cooke*, 194 Mich App 534; 487 NW2d 497 (1992). A fundamental characteristic of the doctrine is that it is exclusively a seizure rationale. No searching, no matter how minimal, may be done under the auspices of the plain view doctrine. See, e.g., *Arizona v Hicks*, 480 US 321; 107 S Ct 1149; 94 L Ed 2d 347 (1987). Another fundamental characteristic of the doctrine is that, unlike most exceptions to the warrant requirement, it is not predicated on exigent circumstances. Instead, it is permitted in the interest of police convenience. *Coolidge v New Hampshire*, 403

---

[6] A third requirement, that officers discover the items inadvertently, was originally required by the United States Supreme Court's plurality opinion in *Coolidge v New Hampshire*, 403 US 443; 91 S Ct 2022; 29 L Ed 2d 564 (1971). The Court later rejected this "inadvertence requirement" in *Horton*.

US 443; 91 S Ct 2022; 29 L Ed 2d 564 (1971). It would be unreasonably inconvenient to require the police, once they have made a valid intrusion and have discovered probable evidence in plain view, to leave, obtain a warrant, and return to resume a process already in progress.

The requirement that the item's incriminating character be "immediately apparent" in order for the item to be properly seized was explained and clarified in *Texas v Brown*, 460 US 730; 103 S Ct 1535; 75 L Ed 2d 502 (1983), in which the Court noted:

> Decisions by this Court since *Coolidge* indicate that the use of the phrase "immediately apparent" was very likely an unhappy choice of words, since it can be taken to imply that an unduly high degree of certainty as to the incriminatory character of evidence is necessary for an application of the "plain view" doctrine. [*Id.* at 741.]

In *Brown*, a police officer saw a green party balloon, knotted near the tip, drop from a man's hand to the seat during a valid traffic stop. The officer also saw plastic vials, quantities of loose white powder, and an open bag of party balloons in the glove compartment. The officer seized the balloon and arrested the driver. Later testing revealed that the balloon contained heroin.

The lower court in *Brown* required near certainty that the balloon was seizable. The United States Supreme Court disagreed, stating that "immediately apparent" means that without further search the officers have "probable cause to believe" the items are seizable. *Id.* at 741-742.

While *Brown* was a plurality decision, the United States Supreme Court later made clear in *Arizona v*

*Hicks, supra,* that probable cause is the level of suspicion required in the plain view context. In *Hicks,* officers validly entered a "squalid and otherwise ill-appointed" apartment. 480 US 323. They noticed some expensive stereo equipment that seemed out of place. An officer, suspecting it was stolen, moved the equipment so that he could read the serial numbers on it. Police headquarters later confirmed that the equipment was stolen. The Court held that moving the equipment to get at the serial numbers was a search, and thus went beyond the permissible scope of the plain view doctrine. The equipment was not validly seized because the officer lacked probable cause to believe it was seizable before moving it. The "immediately apparent" language was not satisfied because the officer could not form probable cause upon viewing the object, but had to manipulate the object, going beyond the authorized plain view search.

2

### DICKERSON

The *Dickerson* Court began its analysis by reviewing its decision in *Michigan v Long,* 463 US 1032; 103 S Ct 3469; 77 L Ed 2d 1201 (1983). The *Long* Court held:

> "If while conducting a legitimate *Terry* search of the interior of the automobile, the officer should, as here, discover contraband other than weapons, he clearly cannot be required to ignore the contraband, and the Fourth Amendment does not require its suppression in such circumstances." [*Dickerson, supra* at 374, quoting *Long, supra* at 1050.]

The holding in *Long* was justified under the plain view doctrine that states that if police are lawfully in

a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant. The Court in *Dickerson, supra* at 375, further noted:

> If, however, the police lack probable cause to believe that an object in plain view is contraband without conducting some further search of the object—i.e., if "its incriminating character [is not] 'immediately apparent,'" *Horton, supra* at 136 . . .—the plain-view doctrine cannot justify its seizure. *Arizona v Hicks*, 480 US 321; 107 S Ct 1149; 94 L Ed 2d 347 (1987).

Thus analogizing to the plain view doctrine, the Court articulated the standard to be applied in the plain feel context:

> If a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass *makes its identity immediately apparent,* there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons; if the object is contraband, its warrantless seizure would be justified by the same practical considerations that inhere in the plain view context.
>
> . . . Regardless of whether the officer detects the contraband by sight or by touch, however, the Fourth Amendment's requirement that the officer have *probable cause to believe that the item is contraband* before seizing it ensures against excessively speculative seizures. [*Dickerson, supra* at 375-376 (emphasis added).]

In *Dickerson,* cocaine seized from the defendant's jacket pocket was suppressed because the patdown search exceeded the scope of *Terry.* The officer detected a small lump in the defendant's jacket pocket during the patdown. However, while keeping

within the bounds of the lawful search, the officer did not have probable cause to believe that the lump was contraband. It was not until the officer slipped his hand into the defendant's pocket, manipulating the object with his fingers, that he determined that the object was a rock of cocaine. In other words, it was not immediately apparent to the officer that the object felt during the lawful patdown was contraband. Probable cause was not formed until the search went beyond the scope of the patdown authorized by *Terry*.

In this case, we adopt the plain feel exception to the warrant requirement as articulated in *Dickerson*. The standard to be applied in Michigan for items discovered during a patdown search is the federal standard.[7] Specifically, an object felt during an authorized patdown search may be seized without a warrant if the item's incriminating character is immediately apparent, i.e., if the officer develops probable cause to believe that the item felt is contraband before going beyond the legitimate scope of the patdown search.

---

[7] Defendant urges us to adopt a requirement that contraband be discovered inadvertently during a patdown in order to be seizable. We decline to do so. *Dickerson* does not impose an inadvertence requirement. Absent a compelling reason, we follow the federal standard when interpreting Michigan's search and seizure provision. See n 3. We find there to be no compelling reason here for us to depart from the federal standard. Further, we believe that an "inadvertence" requirement would afford no greater protection. Such a requirement is purely subjective and could easily be overcome by an officer's claim that discovery of contraband was not a motive behind the patdown search. The requirements of *Terry*, that the patdown be reasonable and of a scope limited to that designed to discover weapons, are sufficient to protect against arbitrary pretextual searches.

3

THE COURT OF APPEALS DECISION

The Court of Appeals in the present case failed to apply the probable cause standard as announced in *Dickerson*. Instead, misconstruing *Dickerson*'s "immediately apparent" language, the Court required a degree of suspicion that approached near certainty.[8]

---

[8] We note that other courts have similarly misconstrued *Dickerson*'s "immediately apparent" language. See *United States v Ross*, 827 F Supp 711 (SD Ala, 1993) (the incriminating character of a matchbox found in the defendant's crotch during a lawful patdown was not immediately apparent and thus did not satisfy *Dickerson*'s "knowledge requirement"); *State v Parker*, 622 So 2d 791 (La App, 1993) (the removal of a matchbox containing contraband was not allowed under *Dickerson* because the identity of the contraband was not readily apparent); *United States v Winter*, 826 F Supp 33 (D Mass, 1993) (the plain feel exception did not apply where the arresting officer repeatedly testified that he did not "know" the incriminating character of the contraband until he removed it).

*Ross* and *Parker, supra*, also imply that the objects felt were not seizable because they were not themselves contraband, but instead were objects thought to contain contraband. We disagree with the distinction between the plain feel of contraband versus the plain feel of an object containing contraband. Such a distinction should be immaterial where probable cause exists and would serve only to encourage better packaging of illicit drugs.

In this regard, we agree with Judge O'CONNELL, dissenting in *People v Massey*, 215 Mich App 639, 645-647; 546 NW2d 711 (1996). Judge O'CONNELL wrote specifically to explain why the present case was wrongly decided by the Court of Appeals:

In *Champion*, the suspicious object was a pill bottle that the officer felt in defendant's groin area during a *Terry* patdown search. This Court pointed out that "[m]erely from feeling the contours of a pill bottle, the officer was able to conclude that defendant carried a pill bottle, not that he carried contraband. . . . [I]t was his visual inspection of the pill bottle, after removing it from defendant, rather than its 'plain feel' that revealed the contents to be cocaine." *Champion, supra*, p 632.

I agree that the item that was "immediately apparent" was a pill bottle and that, in and of itself, this would not give a police officer probable cause to search. However, a pill bottle located in a person's groin does give the police officer probable cause to search. A police officer of reasonable caution would be justified in removing the pill bottle from defendant's groin.

This is evident in the following excerpt from the Court of Appeals opinion:

In this case, it is clear that the patdown was proper under *Terry*. *However, we find it impossible to conclude that the incriminating nature of a pill bottle is immediately apparent. In fact, the police officer was unable to make this determination until he withdrew it from defendant's pants and examined it visually so as to conclude that it contained cocaine. Merely from feeling the contours of a pill bottle, the officer was able to conclude that defendant carried a pill bottle, not that he carried contraband.* The police officer claimed that people often carry drugs in pill vials and conceal them on their body. However, it was his visual inspection of the pill bottle, after removing it from defendant, rather than its "plain feel" that revealed the contents to be cocaine.

In *Dickerson*, the Supreme Court concluded that the police officer exceeded the "plain feel" exception when he manipulated the object with his fingers in order to decide what it was. Here, the officer could not make a determination of the contents of the bottle without removing it from

Applying the reasoning of the *Champion* majority to the following hypothetical illustrates its flawed reasoning: Police patdown a suspect and feel a gun holster (the container) strapped to the suspect's leg. Applying the *Champion* logic, this is not probable cause to search, because it is not "immediately apparent" that the suspect has a gun. It is only immediately apparent that he has a holster. This logic is flawed and could have very serious ramifications.

The correct application would be to consider the totality of the circumstances of each situation. Considering the totality of the circumstances surrounding *Champion* and the present case reveals no violation of the Fourth Amendment of the United States Constitution. I would find that feeling a "pill bottle in defendant's groin" or a holster strapped to a suspect's leg, although both are containers, does give the police officer probable cause to search. However, a pill bottle in a suspect's purse is a substantially different issue.

We agree with Judge O'CONNELL and disagree with the dissent's view that *Dickerson* requires that the object felt be contraband rather than contain it.

defendant and visually inspecting it. [205 Mich App 631-632 (emphasis added).]

Just as in the plain view context, the "immediately apparent" qualification in *Dickerson* does not require a higher degree of certainty. Rather, the degree of certainty required for plain feel seizures, just as for plain view seizures, is probable cause. The following explanation by the Court of Special Appeals of Maryland is instructive in this regard:

In *Minnesota v Dickerson*, 508 US [366, 375]; 113 S Ct 2130, 2137; 124 L Ed 2d 334, 345 (1993), the Supreme Court, relying on *Arizona v Hicks*, expressly treated "probable cause" and the state of being "immediately apparent" as synonymous terms within a single sentence.

The phrase "immediately apparent" has, perhaps, contributed to our understanding of the probable cause criterion in one respect. It has helped to focus attention on the issue of *when* the probable cause must have accrued. It does not remotely mean that when an officer legitimately sees an object in plain view, the "light bulb" in the officer's head must go on instantaneously. The thinking process may be more deliberative than that, as the officer carefully forms a hypothesis, rolls the possibilities and probabilities back and forth . . . and ultimately concludes that, indeed, he has probable cause.

What it means, rather, is that the data-gathering process, as opposed to the conclusion-drawing process, must be completed before the justification for the valid intrusion—such as the search for guns and gunmen in *Hicks*, the frisk for weapons in *Minnesota v Dickerson*, or the voluntary consent in the case before us—runs out. Any further and incremental intrusion beyond that point, such as the lifting of stereo equipment from a table top in *Hicks* after the search for guns had been completed or the slithering of an object through the fingers of the policeman in *Minnesota v Dickerson* after the frisk for weapons had been completed, is invalid and cannot, therefore, serve as the prior valid

> intrusion necessary for a . . . seizure. Once the purpose of the prior intrusion has been served, the validity of that intrusion is at an end. Any additional clues, gathered thereafter, will be *per se* the products of what has by then degenerated into an invalid intrusion. [*State v Jones*, 103 Md App 548, 565-566; 653 A2d 1040 (1995).]

Other cases decided after *Dickerson* discussing the plain feel exception confirm that probable cause is the applicable standard. In *State v Buchanan*, 178 Wis 2d 441; 504 NW2d 400 (1993), the Wisconsin Court of Appeals upheld a trial court's denial of a motion to suppress. In that case, the arresting officer testified that he immediately recognized the incriminating character of a plastic bag found in the defendant's waistband during a patdown search. The court did not require knowledge or near certainty that the bag contained contraband. Instead, the court reasoned, "[g]iven what the officer knew about the storage of cocaine, his conclusion about the character of the plastic baggie appears reasonable." *Id.* at 450.

Similarly, in *State v Wilson*, 112 NC App 777, 781; 437 SE2d 387 (1993), the court noted that the resolution of whether the incriminating character of a lump felt in the defendant's pocket was "immediately apparent" was made difficult "because the Supreme Court failed, for whatever reason, to provide a definition or a test for the phrase 'immediately apparent.'" After reviewing other courts' interpretations of the term, the court concluded that "we need only determine whether [the officer] had probable cause to believe that the contraband he felt during his pat down search was cocaine." *Id.* at 782.

4

## APPLICATION OF THE *DICKERSON* STANDARD

In contrast to the facts in *Dickerson*, Officer Todd immediately felt what he described as a pill bottle tucked inside defendant's groin region.[9] Officer Todd did not further manipulate or grope the object in order to determine its incriminating character.[10]

---

[9] Officer Todd testified at the pretrial hearing that from his "personal experience of dealing with drugs, ah, for the past twenty years, and knowing that that's how the, ah, substance is—is carried and packaged, I, ah, removed the pill bottle from his pants, and seen it contained, ah, white powder."

Later, at the midtrial suppression hearing, Officer Todd testified:

*Q.* Officer Todd, can you describe the procedures you followed when you searched the defendant's person, please.

*A.* I simply patted down the outer clothing of the defendant to check for any possible weapons, being aware of Mr. Champion's history and the fact that he wouldn't remove his hands from inside his pants, I mean, for obvious reasons.

*Q.* Did you think this was anything out of the ordinary?

*A.* I felt for my own personal safety that I should—I should pat him down.

*Q.* Okay. At the time you were patting him down, that was his outer clothing, would that be true?

*A.* That's correct.

*Q.* And did you feel anything out of the ordinary at that time?

*A.* Yes, I felt a pill bottle stuck down between his legs.

*Q.* Did you know for sure that this was a pill bottle at that time?

*A.* I assumed it was. I mean, I could tell it was a pill bottle.

[10] The dissent states that it is "confident that the amount of frisking that took place between the time Officer Todd detected that the lump in defendant's groin area was not a weapon and the time he determined it was the type of pill bottle used to carry drugs far exceeded the impermissible frisking that narrowed the identity of the small lump in Dickerson's nylon jacket pocket to a rock of crack cocaine." *Post* at 126-127. There is no evidence indicating that Officer Todd's frisk exceeded the scope authorized by *Terry*. Unlike *Dickerson*, Officer Todd did not reach inside the defendant's clothing to further manipulate the object before determining its identity. During an authorized patdown, upon feeling a hard concealed object, the officer will necessarily feel through the layers of clothing and focus his touch on the object's contours in order to determine

With due deference to the trial court's findings, we conclude that, upon feeling the pill bottle, under a totality of the circumstances, the officer had probable cause to believe that the pill bottle contained contraband.[11] The following facts support this conclusion: (1) the defendant got out of his car and walked away upon seeing the patrol car and uniformed officers,[12] (2) Officer Todd recognized defendant and knew of his previous drug and weapons convictions, (3) the officers were in a high drug crime area, (4) the defendant had his hands tucked inside the front of his

---

whether it is a weapon. Officer Todd's testimony clearly indicates that as he felt the contours of the object, he immediately determined that it was a pill bottle. The dissent's attempts to characterize Officer Todd's actions as going beyond the bounds of *Terry* are disingenuous.

[11] Probable cause does not require certainty. Rather, it requires only a probability or substantial chance of criminal activity. *Illinois v Gates*, 462 US 213, 243-244, n 13; 103 S Ct 2317; 76 L Ed 2d 527 (1983).

[12] The dissent contends that this fact "has no credible basis in the record." *Post* at 130. While we realize that the trial court ultimately found Officer Chontos' testimony, in toto, to be more credible than that of Officer Todd, and that Officer Chontos testified that he never saw the defendant get out of his car, we remain convinced that the testimony of both officers supports a finding that the defendant got out of his car after seeing the patrol car. Merely because the younger Officer Chontos did not actually see the defendant leave his car does not mean that there is no credible evidence in the record of defendant's furtive behavior. The dissent states that it was "at a loss to explain" how the defendant could have gotten from his car to where he stood on the sidewalk without Officer Chontos noticing. *Id.* at 131, n 6. However, Officer Chontos testified that when the patrol car rounded the corner he "wasn't looking in the immediate vicinity of the Buick right away." Rather, he "was looking for the person that rounded the block so I didn't see it until we approached the vehicle when Mr. Champion was walking away from the front of the vehicle." The dissent concedes that Officer Chontos observed defendant on the sidewalk walking away from the front of his car after the officers rounded the corner. This testimony is consistent with a finding that defendant had just gotten out of the car upon seeing the officers.

We also disagree with the dissent's characterization of this first factor as "perhaps the most important" in our totality of the circumstances analysis and decline to suggest that any one factor is controlling. *Id.* at 130.

sweatpants while walking away from the officers and
refused to take his hands out of his sweatpants after
being repeatedly asked to do so, and (5) Officer Todd,
having had twenty years experience as a police
officer, was aware that contraband, and in particular
controlled substances, were often carried in the type
of pill bottle that he felt on defendant's person. We
cannot imagine that any reasonable person in Officer
Todd's position, given all the above circumstances,
could have concluded that Mr. Champion was carry-
ing prescription medication, or any other legitimate
item, in the pill bottle in his groin region.[13]

We emphasize that courts applying the plain feel
exception must appreciate the totality of the circum-
stances in the given case. *Dickerson* requires an in-
depth examination of probable cause. We therefore
caution that our holding is limited to the facts before

---

[13] The dissent argues that we rely on the flight of other individuals,
rather than on any suspicious behavior personal to the defendant, in our
probable cause analysis. While the furtive behavior of the individual
standing on the corner and the other individual fleeing from the parked
car contribute to the totality of the circumstances, it is a gross mis-
characterization of the evidence to state that defendant's behavior was not
suspicious. The defendant, known to Officer Todd through past contact,
was walking away from his parked car with his hands down his
sweatpants in a known high-crime area. He refused to stop or to remove
his hands after repeated requests by the officers.

Further, after careful scrutiny of the record, the dissent's assertion that
defendant was walking toward the officers, rather than walking away
from them, is totally unsupported. Officer Chontos testified that when he
first saw him, the defendant was on the sidewalk at the front of the
parked Buick. At this time, the officers parked diagonally in front of the
Buick. As the officers got out of their patrol car, the defendant was walk-
ing away from the front of the Buick in the direction from which the
officers had just come. He continued walking as the officers commanded
him to stop at least two and possibly three times. Although the exact dis-
tance between the Buick and the patrol car and between the defendant
and the officers is unclear in the record, the testimony clearly does not
support a finding that defendant, when apprehended, was walking toward
the officers.

us. For instance, if the pill bottle in Mr. Champion's possession had been found in his jacket pocket, or if Mr. Champion had not had his hands inside his sweatpants and he had no pockets in which to carry a pill bottle, the result may have been different. It is only under the totality of the circumstances before us, i.e., the defendant's furtive behavior, his refusal to remove his hands from his sweatpants, the officer's recognition of defendant, and his knowledge of defendant's past involvement in drug crimes, that we find that removal of this particular pill bottle was authorized.

The dissent bemoans that defendant's constitutional rights are jettisoned merely because he happens to live in a poor neighborhood and has a police record and because he engaged in "the simple act of putting his hands down his pants . . . ." *Post* at 142. The dissent also complains that we rely on the flight of others to infer guilt on the part of the defendant. We again emphasize that it is only under the totality of the circumstances that seizure of this pill bottle is authorized.

We note that the Court of Criminal Appeals of Tennessee reached the same conclusion upon facts similar to this case. In *State v Bridges*, 1995 Tenn Crim App LEXIS 1006 (December 28, 1995), the officer was acting on a tip from a reliable informant that the defendant, Bridges, was at a certain location selling crack cocaine. The officer found the defendant at that location. While frisking him for weapons, the officer touched the defendant's right jacket pocket and " 'immediately recognized a pill bottle . . . .' " *Id.* at *4. The officer testified that he knew such bottles were frequently used by dealers to hold their crack

cocaine. The officer removed the pill bottle. After concluding that the officer was engaged in a valid frisk when he felt the pill bottle, and that he immediately recognized the object as a pill bottle, the court focused on whether the officer had probable cause to conclude that the pill bottle was contraband.[14]

> In the instant case, [the officer] received information from an informant that the appellant was selling crack cocaine at Preacher's Place and was carrying cocaine on his person. [The officer] was also aware that the appellant had previously been convicted of a drug-related offense. While [the officer] was conducting a lawful frisk of the appellant, he encountered an object which he "immediately recognized" to be a pill bottle. [The officer] testified that, based on his experience, he immediately "knew that it was the kind that a lot of other crack dealers will use to keep their crack in." We conclude that [the officer] possessed probable cause to believe that the pill bottle contained crack cocaine. Therefore, the seizure of the pill bottle from the appellant's person was valid. [*Id.* at *18-19.]

In the present case, because the patdown did not exceed the scope of *Terry*, i.e., it was immediately apparent during the authorized patdown that Mr. Champion was carrying a pill bottle in his groin region, and because there was probable cause that the object felt during the patdown contained contraband, the plain feel exception to the warrant requirement authorized removal of the pill bottle from Mr. Champion's sweatpants.

---

[14] While the presence of a tip in *Bridges* bolsters a finding of probable cause in that case, certain facts in the present case, such as the location of the pill bottle and the officer's firsthand knowledge of the defendant, make a finding of probable cause in this case equally, if not more, compelling.

While the plain feel exception authorized removal of the pill bottle, the question whether the officer was authorized to open the bottle without a warrant remains.

C

SEARCH INCIDENT TO ARREST

A custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment. By statute, an arresting officer must possess information demonstrating probable cause to believe that an offense has occurred and that the defendant committed it. MCL 764.15;   MSA 28.874. Probable cause to arrest exists where the facts and circumstances within an officer's knowledge and of which he has reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed. *Brinegar v United States*, 338 US 160, 175; 69 S Ct 1302; 93 L Ed 1879 (1949).

A search of a person incident to an arrest requires no additional justification. *United States v Robinson*, 414 US 218; 94 S Ct 467; 38 L Ed 2d 427 (1973); *People v Chapman*, 425 Mich 245; 387 NW2d 835 (1986). The permissible scope of a search incident to arrest extends to the opening of containers found within the control area of the arrestee. *Robinson* and *Chapman*, *supra*. See also *New York v Belton*, 453 US 454; 101 S Ct 2860; 69 L Ed 2d 768 (1981).

A search conducted immediately before an arrest may be justified as incident to arrest if the police have probable cause to arrest the suspect before con-

ducting the search. *Rawlings v Kentucky*, 448 US 98;
100 S Ct 2556; 65 L Ed 2d 633 (1980).[15]

In a unanimous opinion authored by Justice Levin,
this Court held that a search without a warrant of
persons whom the police had probable cause to
arrest was proper, even though the persons searched
had not been formally arrested. *People v Arterberry*,
431 Mich 381; 429 NW2d 574 (1988). Justice Levin
reasoned:

> Since the officers had probable cause to arrest Arterberry
> and the other occupants, the search was proper: had the
> occupants been arrested, they could have been searched
> incident to the arrest. The validity of the search is not
> negated by the failure of the officers to arrest the occu-
> pants. [*Id.* at 384.][16]

The search of a container preceding a formal arrest
can qualify as a search incident to arrest if probable
cause for the arrest existed before the container was
searched. See, e.g., *State v Roach*, 234 Neb 620; 452
NW2d 262 (1990). However, a search of a container
cannot be justified as being incident to an arrest if
probable cause for the contemporaneous arrest was

---

[15] In *Rawlings* at 111, police searched the defendant who had admitted
ownership of drugs that police found in a companion's purse. After
searching the defendant, police arrested him. The Court reasoned that it
was not "particularly important that the search preceded the arrest"
because the police had probable cause to arrest the defendant before the
search and "the formal arrest followed quickly on the heels of the chal-
lenged search . . . ." *Id.*

[16] In *Arterberry*, a warrant was issued to search a specific premises and
a specific person for heroin and other controlled substances. In the
course of searching the premises, the police opened a padlocked toolbox
and found controlled substances inside. The police then searched all
seven occupants of the home, finding a key to the toolbox in the posses-
sion of defendant Arterberry. Mr. Arterberry was not listed on the warrant.

provided by the fruits of that search. *Smith v Ohio*, 494 US 541; 110 S Ct 1288; 108 L Ed 2d 464 (1990).

These principles apply to the opening of the pill bottle retrieved from defendant Champion's sweatpants. The officer had probable cause to arrest before he opened the pill bottle. As explained in our earlier analysis, the officer had probable cause to believe that Mr. Champion was carrying contraband even before removing the pill bottle. The officer's suspicion heightened once he retrieved the bottle and visually verified its identity. To reiterate, the officer formed probable cause to arrest on the basis of the defendant's furtive behavior after seeing the marked patrol car, defendant's refusal to remove his hands from his sweatpants, the officer's recognition of defendant from defendant's past involvement in drug crimes, the finding of the pill bottle in defendant's groin region, and the officer's knowledge that illicit substances were frequently carried in such a manner.

Because probable cause existed before the bottle was opened, and because the bottle was in "the control area" of defendant when seized, the opening of the pill bottle was authorized as a search incident to arrest.[17]

### III

### CONCLUSION

We hold that the cocaine found in the pill bottle in Mr. Champion's sweatpants was properly seized.

---

[17] The dissent's argument that the pill bottle, being a closed container, could not have been searched under the plain view doctrine, and thus should not be allowed under the analogous plain feel doctrine, misses the point. The search of the closed container is not authorized by the plain feel doctrine. Rather, it is authorized as a search incident to arrest.

When viewed in the light of the totality of the circumstances, the officers had reasonable suspicion to stop Mr. Champion. Further, the patdown search that revealed the pill bottle was reasonable and did not exceed the scope authorized by *Terry*. During the patdown, the officer felt what he immediately identified as a pill bottle in the groin region of defendant Champion's sweatpants. On the basis of the totality of the circumstances, the officer had probable cause to suspect that the bottle contained contraband in the form of a controlled substance, and thus was authorized under the plain feel exception to remove the bottle. Having probable cause to believe that Mr. Champion was unlawfully in possession of a controlled substance, the officer was authorized to open the pill bottle under the search incident to arrest exception to the warrant requirement. For these reasons, we reverse the Court of Appeals ruling that the cocaine found in the defendant's possession was unlawfully seized.

Reversed.

BOYLE, RILEY, and WEAVER, JJ., concurred with MALLETT, J.

BRICKLEY, C.J. (*dissenting*).

I

I cannot agree with the majority that the search and seizure conducted in this case comported with the strict requirements of the Fourth Amendment. In my view, the majority misapplies the recent United States Supreme Court decision in *Minnesota v Dickerson*, 508 US 366; 113 S Ct 2130; 124 L Ed 2d 334 (1993), and ignores the clear prohibitions set forth in

*Terry v Ohio*, 392 US 1; 88 S Ct 1868; 20 L Ed 2d 889
(1968), and its progeny. Accordingly, I respectfully
dissent.

II

The majority contests that this Court "did not grant
leave in this case to hear again the relative merits of
the *Terry* doctrine." *Ante* at 100. The grant in this
case was, in fact, not so limited. The Court of Appeals
addressed the legitimacy of the *Terry* stop, and the
defendant in this Court, although not arguing that the
police lacked the authority to stop him and conduct a
limited patdown, has clearly objected to the seizure
of the pill bottle and the extent of the frisk that led to
it. The defendant has always maintained, as his brief
before us clearly illustrates, that "the manipulation of
the pill vial went beyond the scope of a valid *Terry*
stop . . . ." Thus, to the extent the majority believes
the defense has waived or conceded this element of
the *Terry* analysis, it is flatly wrong. A substantial
constitutional right of the defendant has been
abridged and should be addressed.

The majority is correct, however, in noting that the
issue before us is the propriety of a seizure of contra-
band discovered during this limited patdown. The
majority relies on *Dickerson* to justify that seizure.
*Dickerson*, ironically, is all about the limits of *Terry*.
In *Dickerson*, the United States Supreme Court con-
sidered the propriety of a *Terry* stop, and then care-
fully explored the boundaries of a legitimate *Terry*
stop before concluding that a plain feel seizure could
not be permitted because the requisite level of cer-

tainty had not been obtained within the confines of *Terry*.[1]

Still, in the course of relying on the "plain feel doctrine" taken from dicta in *Dickerson*,[2] the present majority criticizes my reliance on *Terry*. At the same time, however, the majority fails to take note that the United States Supreme Court similarly relied on *Terry* when it decided *Dickerson*.

The majority's criticism, in my view, is based in large part on a fundamental misunderstanding of *Terry*'s basic holding. *Terry* involved both a stop and a frisk. Just because one may be justified does not automatically lead to the conclusion that the other is also. Thus, even if defendant's apparent concessions might preclude a dispositive review of the stop, we are not similarly prohibited from scrutinizing the frisk. *Terry* is indeed relevant, if not altogether determinative of the issues before us. Thus, I consider a

---

[1] It should be noted that the defendant in *Dickerson* did not challenge the propriety of the *Terry* stop and frisk. His failure to do so did not, however, prevent the United States Supreme Court from examining the propriety of the officer's actions with *Terry* as the baseline:

Respondent has not challenged the finding made by the trial court and affirmed by both the Court of Appeals and the State Supreme Court that the police were justified under *Terry* in stopping him and frisking him for weapons. Thus, the dispositive question before this Court is whether the officer who conducted the search was acting within the lawful bounds marked by *Terry* at the time he gained probable cause to believe that the lump in respondent's jacket was contraband. [508 US 377.]

[2] Because *Terry* invalidated the search at issue in *Dickerson*, the discussion of the plain feel doctrine was unnecessary to the *Dickerson* Court's conclusion that the evidence should be suppressed. Therefore, that discussion "cannot be considered binding authority." *Kastigar v United States*, 406 US 441, 455; 92 S Ct 1653; 32 L Ed 2d 212 (1972). The allegiance of numerous federal courts to the plain feel doctrine does not change the analysis.

careful examination of the extent of the *Terry* search to be on procedurally sound ground and, moreover, compelled by the sole, if dubious, precedent relied on by the majority.

As will be discussed below, if the plain feel doctrine were truly as broad as the majority describes it, it would be in irresolvable conflict with other constitutional doctrines of uncontroverted validity. In order to prevent the plain feel exception to the warrant requirement from swallowing the Fourth Amendment, its limitations must be strictly observed. One such limitation is the requirement that probable cause to make the seizure be obtained within the legitimate scope of a *Terry* search. By defining the "issue before us" to include the exception, but not its limitations, the majority takes a treacherous step, facilitating the danger the *Dickerson* Court warned of, "that officers will enlarge a specific authorization, furnished by a warrant or an exigency, into the equivalent of a general warrant to rummage and seize at will." 508 US 378.

Indeed, the authority to conduct a so-called "stop and frisk" is not absolute. *Terry*, while authorizing such searches, also placed clear limits on a police officer's authority to carry them out. In my view, the search conducted in this case exceeded these limits.[3] *Terry* allows police to conduct a limited "patdown"

---

[3] Without analysis, the majority announced that the investigative stop was supported by a "reasonable particularized suspicion." *Ante* at 99, n 4. It should be noted, however, that the existence of such a suspicion was an issue never squarely before this Court. In fact, for some reason, defendant has conceded the issue throughout these proceedings. Any corresponding discussion in the majority opinion is, therefore, merely dicta and should not be read as modifying this Court's prior stop and frisk jurisprudence. See *People v Shabaz*, 424 Mich 42; 378 NW2d 451 (1985).

search for weapons during the course of a valid investigatory stop if an officer has a reasonable suspicion, based on articulable facts, that the detained individual is an armed threat. A dual inquiry is called for when deciding whether a patdown search for weapons exceeded its proper scope: first, courts must decide whether the patdown search was "justified at its inception" and, second, whether "it was reasonably related in scope to the circumstances which justified the interference in the first place." 392 US 20.

Because defendant failed to argue the point, this Court must assume that the first part of this inquiry has been satisfied. As for the second part of the inquiry, Officer Todd's removal and examination of the pill bottle was not "reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* The circumstances that confronted Officer Todd and supposedly justified his patdown of defendant involved his fear that defendant was armed. However, all parties concede that, when Officer Todd "patted" the pill bottle, he knew he was not feeling a weapon. In fact, the linchpin of the people's argument is that Officer Todd immediately recognized that he was feeling a pill bottle. Thus, unless we assume that a pill bottle can be used as a weapon, its removal from defendant's person was unnecessary to assure the safety of Officer Todd and, therefore, unrelated to the circumstances that justified the patdown.

This argument is even stronger with respect to Officer Todd's inspection of the pill bottle's contents. In other words, even if one were to assume that Officer Todd was justified in removing the pill bottle from defendant in order to insure his safety, clearly,

once the bottle had been removed from defendant, there was no such exigency requiring him to open the bottle and look inside.

However, the conclusion that *Terry* did not provide police with authority to remove the pill bottle does not go far enough. A fair reading of *Terry* reveals that the United States Supreme Court did not just fail to provide authority for the search conducted by Officer Todd; that Court altogether *prohibited* this sort of search in the clearest possible terms:

> A search for weapons in the absence of probable cause to arrest, however, must, like any other search, be strictly circumscribed by the exigencies which justify its initiation. Thus, it must be limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby . . . . [392 US 25-26 (citations omitted).]

*Sibron v New York*, 392 US 40; 88 S Ct 1889; 20 L Ed 2d 917 (1968), which the Supreme Court decided on the same day as *Terry*, applied *Terry*'s prohibitive language. In *Sibron*, an officer seized heroin from a detainee's pockets during an investigatory stop. The Supreme Court suppressed the evidence because the officer conducted the search at a time when he knew the detainee had no weapon. The Court explained that *Terry* prohibited the search because it

> was not reasonably limited in scope to the accomplishment of the only goal which might conceivably have justified its inception—the protection of the officer . . . . [392 US 65.]

The Supreme Court again affirmed this principle in *Adams v Williams*, 407 US 143, 146; 92 S Ct 1921; 32 L Ed 2d 612 (1972). The Court reasoned:

The purpose of this limited [*Terry*] search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence . . . .

This language and the language cited from *Sibron* must be understood in the context of the dilemma that the Supreme Court faced when it decided these cases. The Court worried that unrestricted powers to patdown without probable cause would lead to police abuses. At the same time, the Court wanted to provide additional self-protection to law enforcement officers in their fight against street violence. Thus, it struck a balance between according citizens their right to be free from governmental intrusion on the one hand, and police officers' understandable concerns for self-preservation on the other.

*Terry*, in fact, reflected the Court's deep concern that such a balance would not be struck if the police possessed broad powers to stop and frisk. *Terry* makes specific mention of a presidential report partially blaming police harassment of minority groups for the civil disturbances of the late 1960's. This report fervently criticizes "the wholesale harassment" of minority groups accomplished through unjustified investigatory stops, condemning such behavior as a major factor in police-community tensions. See 392 US 14-15, n 11. The last thing the Court wanted was to provide officers with an incentive to conduct pretextual patdown searches and later claim that they were justified by officers' legitimate fear for their safety.

In response to the concern that unbridled power to stop and frisk would lead to police excesses, the United States Supreme Court has vigilantly expressed its concern about expanding a police officer's power

to seize more than just weapons during the course of a patdown search. Fifteen years after *Terry,* in *Texas v Brown,* 460 US 730, 748; 103 S Ct 1535; 75 L Ed 2d 502 (1983) (Stevens, J., concurring), Justice ·Stevens noted the Court's continuing sensitivity to the danger that "officers will enlarge a specific authorization, furnished by a warrant or an exigency, into the equivalent of a general warrant to rummage and seize at will." See also *Minnesota v Dickerson, supra* at 378.

However, these more contemporary practical concerns are not the only ones that militate against what would be an enhancement of police officers' ability to seize items detected during an investigative patdown search. As Justice Scalia pointed out in his concurring opinion in *Dickerson,* there is absolutely no evidence to suggest that the framers of the Fourth Amendment would have approved of the type of search and seizure conducted in this case. To the contrary, I agree with Justice Scalia that there is serious doubt "whether the fiercely proud men who adopted our Fourth Amendment  would have allowed themselves to be subjected, on mere *suspicion* of being armed and dangerous," to the "indignity" of the intrusive patdown search. 508 US 381 (Scalia, J., concurring; emphasis in original).

Even recognizing that Justice Scalia did not command a majority in *Dickerson,* nevertheless, I remain unconvinced that the present majority has properly applied the rule that *Dickerson* announced. *Dickerson,* like the *Terry* progeny cited above, continued to express an aversion to widening police powers to search during routine street encounters. In fact, the Supreme Court ultimately excluded evidence pro-

cured during a stop and frisk that was much less
intrusive than the one this Court currently examines.

In *Dickerson*, a police officer felt a small lump in
defendant's front pocket during a patdown for weap-
ons. Unlike Officer Todd, who retrieved a pill bottle
from defendant's groin area and then opened it, the
officer in *Dickerson* merely examined the lump with
his fingers while the lump was still in defendant's
pocket. After it slid inside its cellophane "baggie," the
officer removed it and saw that it contained crack
cocaine.

On these facts, the Court held that

> the officer's continued exploration of respondent's pocket
> after having concluded that it contained no weapon was
> unrelated to "[t]he sole justification of the search [under
> *Terry*:] . . . the protection of the police officer and others
> nearby." 392 US 29 . . . . It therefore amounted to the sort
> of evidentiary search that *Terry* refused to authorize, see
> *id.* at 26 . . . and that we have condemned in subsequent
> cases. See *Michigan v Long*, 463 US [1032, 1049, n 14; 103 S
> Ct 3469; 77 L Ed 2d 1201 (1983)]; *Sibron*, 392 US 65-
> 66 . . . . [508 US 378.]

The majority in this case seeks to distinguish *Dick-
erson* from the case at bar on the ground that the
officer in *Dickerson* had to examine the object he felt
with his fingers and slide it around, while Officer
Todd did not have to conduct such an examination to
conclude that he was feeling a pill bottle. The major-
ity is wrong to draw such a distinction.

To begin with, I am confident that the amount of
frisking that took place between the time Officer
Todd detected that the lump in defendant's groin area
was not a weapon and the time he determined it was
the type of pill bottle used to carry drugs far

exceeded the impermissible frisking that narrowed the identity of the small lump in Dickerson's nylon jacket pocket to a rock of crack cocaine. Common sense demands the conclusion that Officer Todd persisted in his probing until he knew, through two layers of clothing, one of which was a baggy sweat suit, that the object he detected was a pill bottle of the sort used to carry drugs and not a weapon.

It is essential to the majority's final and essential conclusion that Officer Todd had probable cause to arrest defendant that Officer Todd could recognize this type of bottle as a customary vessel for narcotics. However, that degree of certainty cannot be reconciled with the conclusion here that Officer Todd stopped his *Terry* frisk immediately upon determining that the lump was not a weapon, as the constitution requires. Even the most thorough review of the trial record on this critical point of the investigation provides no details of the search. In every narration of the frisk, Officer Todd simply and immediately leapt from the intention to search for a weapon to the discovery of the pill bottle. Yet, despite the absence of recorded information about this search, the second reviewing Court is confident no constitutional errors have been committed even though the counsel of common sense directs otherwise. At the very least, this case should be remanded for further findings on this point.

It should also be pointed out that *Dickerson* allows an object felt during the course of a lawful *Terry* search to be admitted into evidence only where *that particular object's* mass and contour make *its* incriminating character "immediately apparent." The Supreme Court could not have been more clear:

> If a police officer lawfully pats down a suspect's outer
> clothing and *feels an object* whose contour or mass makes
> *its identity* immediately apparent, there has been no inva-
> sion of the suspect's privacy beyond that already authorized
> by the officer's search for weapons; if *the object* is contra-
> band, its warrantless seizure would be justified by the same
> practical considerations that inhere in the plain view con-
> text. [508 US 375-376 (emphasis added).]

Even assuming a plain feel, the item felt in this
case, was a pill bottle. There is nothing illegal about
possessing one. Accordingly, a pill bottle is not and
cannot be contraband. Thus, a fortiori, there is no
way that Officer Todd could believe that it was.
Indeed, the majority seems to confuse the item felt
with the *contents* of the item felt.[4]

This distinction is not as insignificant as the major-
ity suggests. As the above excerpt indicates, *Dicker-
son* authorizes the seizure of contraband discovered
by a plain feel if it can be justified by the same ration-
ale that justifies plain view seizures. As the Supreme
Court explained in *Arizona v Hicks*, 480 US 321; 107
S Ct 1149; 94 L Ed 2d 347 (1987), the rationale under-
lying the plain view doctrine is that where an item is
seized in plain view there has been no invasion of an
individual's legitimate expectations of privacy and,
thus, no Fourth Amendment intrusion. The same can-
not be said of an item concealed in an individual's

---

[4] Footnote 8 of the majority opinion explicitly refuses to draw a distinc-
tion between the feeling of an object that is contraband and the feeling of
an object that contains contraband. The majority, in fact, rejected the
approach to the contrary adopted by the Louisiana Court of Appeals in
*State v Parker*, 622 So.2d 791 (La App, 1993), saying that such an
approach would only encourage "better packaging of illicit drugs." *Ante* at
106, n 8. I disagree with this premise and point out that the majority's
approach encourages a contrary evil—unauthorized and pretextual Fourth
Amendment intrusions.

underpants. In fact, I cannot think of an area where an individual has a greater expectation of privacy. Even if an officer's initial touching was justified by legitimate fears for safety or by some other exigency, the seizure and examination of an item felt will almost always entail a further Fourth Amendment intrusion and, therefore, run astray of the *Hicks* rationale.

Indeed, it should be stressed that the plain view doctrine would not permit a seizure if executing the seizure required puncturing a previously unruptured expectation of privacy. A police officer who observes contraband through the uncurtained window of a house cannot enter without a warrant in the name of making a plain view seizure.

Likewise, the plain feel doctrine is only consistent with the broader Fourth Amendment jurisprudence if seizures under it are limited to those cases in which the seizure itself will not invade a legitimate expectation of privacy. This restriction reveals a tension inherent in the proposed new doctrine. In the plain view cases, where the absence of any object obstructing the view of the officer generally means that nothing stands between the officer and the object to be seized, it will generally be true that "[t]he seizure of an item whose identity is already known occasions no further invasion of privacy." 508 US 377. It may also be true when an officer removes a single rock of cocaine from an exterior pocket of a jacket, as in the case before the Court in *Dickerson*; but, as the example of the curious officer given above indicates, it is by no means true in every instance. In this case, the application of a doctrine that purports to make no additional incursions into the privacy of citi-

zens allows a police officer either to pull down or reach into the pants of an individual in the middle of the street in broad daylight.

The majority tries to avoid this problem by justifying the examination of the pill bottle without a warrant as a search incident to a lawful arrest. See *ante* at 117, n 17. While I agree with the majority's assertion that such a search would have been warranted under *New York v Belton*, 453 US 454; 101 S Ct 2860; 69 L Ed 2d 768 (1981), had Officer Todd possessed probable cause to arrest on feeling the pill bottle, I do not think that probable cause, in fact, existed.

The majority found that five facts combined to give Officer Todd the probable cause necessary to arrest Mr. Champion.[5] At least one of the majority's factual findings in this regard—perhaps the most important one—however, has no credible basis in the record. According to the trial judge, the only credible evidence presented on the record was that the officers never saw defendant step out of his vehicle. Indeed, Officer Vern Chontos, Officer Todd's partner, testified that when he first saw defendant, defendant was

---

[5] The five facts that the majority cites are as follows:

(1) the defendant got out of his car and walked away upon seeing the patrol car and uniformed officers, (2) Officer Todd recognized defendant and knew of his previous drug and weapons convictions, (3) the officers were in a high drug crime area, (4) the defendant had his hands tucked inside the front of his sweatpants while walking away from the officers and refused to take his hands out of his sweatpants after being repeatedly asked to do so, and (5) Officer Todd, having had twenty years experience as a police officer, was aware that contraband, and in particular controlled substances, were often carried in the type of pill bottle that he felt on defendant's person. [*Ante* at 111-112.]

already on the sidewalk beside his car.[6] Officer

---

[6] The majority states in footnote 12 of its opinion that Officer Chontos' observation "is consistent with a finding that defendant had just gotten out of the car upon seeing the officers." *Ante* at 111, n 12. I would have agreed with this conclusion had it not been for other relevant testimony. However, the majority seems to forget that these events all occurred within a relatively short time frame lasting perhaps no more than a few seconds. All parties agree that the 1977 Buick of defendant's sister from which he supposedly fled was parked a mere half block from the corner the officers rounded in hot pursuit. I am at a loss to explain how defendant could have magically extricated himself from the car and appeared on the sidewalk in front of it in such a short period of time or how defendant could have gotten there without Officer Chontos noticing. The only credible explanation for Officer Chontos' failure to see defendant leave the car is that defendant did not leave the car, but that he was already on the sidewalk when the police car came down the street. Again, the importance of this fact is that it tends to undermine any claims that defendant acted furtively.

The majority suggests that Officer Chontos did not see defendant's supposed flight from the car because the officer was not looking in defendant's direction, his sight being fixed on the fleeing man he never bothered to chase. Yet, even if I were inclined to accept this testimony, I still could not conclude that Officer Chontos would not have been able to see at least part of defendant's supposed exit. No one is spry enough to see a police car one half a block away round a corner at a rate of speed that Officer Chontos conceded was "rather quick[ ]," decide to exit, execute the exit, and then end up on the sidewalk walking away from the vehicle at a pace that Officer Todd's police report described as "walking," all without being detected by individuals who the majority freely admits were trained to observe such things. Far from being the "rookie" that the majority describes, before joining the Saginaw Police Department, Officer Chontos had been a police officer in another department for about ten years.

Moreover, my conclusion that Officer Chontos would have seen defendant's exit if, in fact, one had been made, of course, precludes discussion of an even larger question. In order to conclude, as the majority does, that Officer Chontos' testimony is "consistent with a finding that defendant had just gotten out of *his* car," we must assume that the officers knew that defendant had some connection to the 1977 Buick from which he supposedly fled. However, the Buick did not belong to defendant; it belonged to his sister, and there is no testimony to support the contention that the officers knew of this fact before they made their stop. To the contrary, the officers did not discover who owned the car until after defendant had been searched, arrested, and a LEIN check had been conducted. The prosecution, in fact, admitted at a pretrial suppression hearing that the car "was parked in front of a field, it could have been anyone's." Thus, if Officer Chontos did not see defendant leave the car, all Officer Chontos

Chontos also made it clear that he never saw a passenger flee from defendant's car at the sight of police. The majority's view of the facts to the contrary appears to depend on the testimony of the arresting officer, Officer John Todd, even though the trial judge ultimately found his testimony to be "inconsistent with the evidence." In fact, when the trial judge ruled upon defendant's suppression motion, he opined:

> The Court finds that its findings of fact set forth in its opinion dated June 18, 1990 has to be changed because the Court finds that the testimony of Officer Todd is inconsistent with the evidence in this case and the Court does not accept Mr.—Officer Todd's version of what occurred. The Court believes that the most credible testimony on this issue was presented by Officer Chontos . . . .[7]

This Court must accord a significant measure of deference to the trial judge's credibility judgment because he was in the best position to decide the officers' respective believability. See *Kirilloff v Glinisty*, 375 Mich 586; 134 NW2d 707 (1965); *People v Eggleston*, 149 Mich App 665; 386 NW2d 637 (1986).

The majority's failure to do so has allowed it to conclude that probable cause to arrest existed when,

---

really knew when he stopped next to defendant was that he was walking in the opposite direction from *a* car that he might have never even been inside.

[7] Footnote 12 of the majority opinion suggests that the trial judge merely found Officer Chontos "more credible" than Officer Todd. *Ante* at 111. The trial judge's excerpted comment, however, goes much further than that. Quite apart from Officer Chontos being "more credible," the trial judge found Officer Todd's testimony to be "inconsistent with the evidence." It only states the obvious to say that when testimony is "inconsistent with the evidence" it is more than just less credible than other evidence. To the contrary, when testimony is "inconsistent with the evidence" it completely lacks credibility. The majority's reliance on it is, therefore, inherently suspect.

in fact, it did not. Once it has been determined that the officers did not see defendant leave his vehicle upon their approach, the finding of probable cause, in my view, is significantly undermined. In effect, we are left with a man standing on the sidewalk somewhat close to the location where a police chase began. He had his hands in his pants. The arresting officer knew defendant and his criminal background. The officer was also aware he was in a drug area. The obvious question is, how do these facts give rise to an inference that defendant was involved in criminal activity? People with past legal troubles travel the streets of high crime areas every day in this country, some may even prefer to walk with their hands in their pants. This behavior should not give rise to a finding of probable cause merely because someone half a block away fled at the sight of a police car.

Yet, even assuming the occurrence of all five factors that the majority cites, they cannot amount to probable cause.

The defendant's presence in a high crime area should not contribute to a finding of probable cause because it "does nothing to distinguish him from any number of other pedestrians in the area." *People v Shabaz*, 424 Mich 42, 60; 378 NW2d 451 (1985). A high crime area ordinarily possesses "both innocent victims and criminal perpetration . . . ." *Id.* at 61. The fact that defendant stood on the sidewalk with his hands in his sweatpants did nothing to distinguish him as a criminal. Indeed, while placing his hands in his pants may rightly be considered in bad taste, I am aware of no law that punishes individuals for such an exercise of poor manners.

Likewise, the defendant's proximity to a police chase should not contribute to a finding of probable cause. The prosecution never credibly linked defendant to the man who fled upon seeing the officers approach the corner of North Fourth and Kirk.[8] In fact, defendant was half a block away from this corner when the police began their pursuit. Under the majority's approach, anyone in the relative vicinity of a police chase would be subject to a *Terry* stop. This result violates the well-established principle that the police must have a suspicion that "the particular individual being stopped is engaged in wrongdoing." *United States v Cortez*, 449 US 411, 418; 101 S Ct 690; 66 L Ed 2d 621 (1981); *People v Faucett*, 442 Mich 153; 499 NW2d 764 (1993).

Moreover, even if defendant had been fleeing, flight does not necessarily contribute to a finding of probable cause. In *Shabaz*, the Court found that the defendant's flight did not, by itself, constitute wrongdoing. The flight did not, in other words, convert the "naked and generalized suspicion of the police officers into articulable grounds to conclude that criminal activity was afoot." *Id.* at 62. See also *Wong Sun v United States*, 371 US 471, 483, n 10; 83 S Ct 407; 9 L Ed 2d 441 (1963):

"[I]t is a matter of common knowledge that men who are entirely innocent do sometimes fly from the scene of a crime through fear of being apprehended as the guilty par-

---

[8] At one point, Officer Todd testified that the fleeing man may have yelled something in defendant's direction. This testimony was later found to be without merit. Specifically, the fleeing man was not facing Officer Todd when the supposed yelling occurred, and eventually Todd admitted that he never actually heard yelling. More importantly, the witness the court found most credible, Officer Chontos, stated that he neither saw nor heard yelling.

ties, or from an unwillingness to appear as witnesses. Nor
is it true as an accepted axiom of criminal law that 'the
wicked flee when no man pursueth, but the righteous are as
bold as a lion.' "

In this case, the majority necessarily relies on the
flight of individuals other than the defendant to estab-
lish the defendant's guilt. Thus, the majority first
presumes that those fleeing must have been guilty,
contrary to the United States Supreme Court's warn-
ing. This fault would no doubt be overlooked by
defendant, however, who demonstrated his innocence
by remaining while the others fled. But in using the
flight of others to make its probable cause determina-
tion, the majority necessarily rejects that premise
only as it applies to defendant, who not only was not
running away from the police, but was *walking
toward* them as they approached from the corner of
North Fourth and Kirk. The only point at which he
arguably could have been considered to be walking
away from them was when the officers passed him
by. Clearly, this cannot be considered furtive behav-
ior.[9] Defendant never changed his direction. He did
not run. He merely kept walking on his way, as he
had been doing when Officer Chontos first saw him.
Thus, the majority necessarily implies not that the
wicked flee while the innocent remain, but that the

---

[9] The majority's finding to the contrary necessarily depends upon the
mistaken notion that police were justified in stopping defendant after he
refused the officer's requests that he stop. As explained below, defend-
ant's refusal to stop cannot be considered furtive. Indeed, the Fourth
Amendment guaranteed defendant's right to be free from the seizure the
majority appears willing to allow. This is especially the case because,
before the stop, police had absolutely no evidence, or even a reasonable
suspicion, that defendant possessed narcotics. See footnote 10.

wicked flee, and the wicked remain if they are near those who flee.

The conclusion that no proper course of conduct remains for the innocent compels the established rule that neither flight from the scene of a crime nor presence in a high crime area can, standing alone, support a finding of reasonable suspicion. I, therefore, would further hold that this combination of factors, which implies the defendant's guilt merely by proximity or association, does not amount to a reasonable suspicion or, by implication, probable cause because it is not joined by some suspicious action or behavior personal to the defendant. See *Cortez, supra*. These personal factors draw some line, albeit dangerously thin, between the guilty and the innocent. Without such a limitation, nothing would prevent the police from warrantless and unwarranted sweeps, shaking down innocent people on suspect streets.

In this case, most of the factors on which the majority conditions its finding of probable cause would have applied equally to any hapless but innocent traveler in the vicinity, from a priest to a Supreme Court justice. Alone, those factors would not justify any intrusion on defendant's liberty. Rather, they properly serve only to heighten an intuition of suspicion born of factors personal to him.

This analysis reveals that the factors that make defendant distinctly and individually suspicious are limited. The majority should have exercised the utmost caution and scrutiny with respect to those traces of guilt, for by that thin thread hung defendant's liberty.

My review of those individual traces of guilt does not lead me to the conclusion that the police acted

properly in this case. Specifically, I do not agree that the position of defendant's hands or his refusal to comply with the officers' demands that he remove them should contribute ·to a finding of probable cause. It is a principle of our constitutional order and an enumerated component of our Bill of Rights that the people shall be free from unreasonable seizures, including seizures of their person. US Const, Am IV. It is an obvious and necessary corollary of that premise that the refusal to obey an unreasonable request to surrender one's liberty can never be considered suspicious.

Although I agree that cooperation with the police is certainly to be encouraged even when not required, our constitution firmly lodges that decision with the individual, not the police or the courts. The police cannot, therefore, transform an otherwise innocent citizen into a suspicious one with repeated unreasonable requests to needlessly surrender constitutional rights. As a matter of pure logic and constitutional law, Officer Todd's seizure of defendant and request that he remove his hands from his pants must have been supported by reasonable and articulable facts amounting to reasonable suspicion *before* he first ordered defendant to stop and remove his hands from his pants.[10] Defendant's refusal cannot, in other

---

[10] The following testimony reveals that neither officer could articulate the requisite suspicion:

> Q. [*By defense counsel*]: Had you seen Mr. Champion do anything illegal on that evening other than get out of his car or something wrong with that?
>
> A. [*Officer Todd*]: No sir.
>
> Q. Ah, did you see, ah, ah, did you see people around his car that, ah, that would have been purchasing drugs or like you might see in other cases?

*A.* No, sir.

*Q.* Now, other than the fact that you know him and that this might be a—a crime area that he was leaving his car, was there anything else that would lead you that you could point to to say to the Court, ah, I stopped Ken Champion because I had reasonable cause to believe he was committing a crime?

*A.* Yes, sir, the fact that the passenger, ah, ran from us—refused to stop. The fact that . . .

*Q.* Okay, how about Ken Champion?

*A.* . . . the fact that Mr. Champion had his hands down in his pants as though he was concealing something from us, and refused to move his hands from his sweatpants. Ah, having to be told, ah, numerous times as it states in my police report. I believe it was at least four times.

*Q.* What were you—what were you stopping him for? What was the—what was the crime?

*A.* Suspicious situation, sir.

Officer Chontos testified similarly:

*Q.* [*By defense counsel*]: Did you see Mr. Champion do anything wrong before you stopped your patrol vehicle?

*A.* [*Officer Chontos*]: As in . . .

*Q.* Did you see him commit a crime before you stopped your patrol vehicle?

*A.* As I—per se, or . . .

*Q.* Yeah. Did you see him do anything?

*A.* It's very abnormal for me to have a person not honor my request to take their hands out of my pocket when I'm fearing for my safety and not having knowledge of what they have their hands on.

*Q.* I appreciate that. The question that I have is, did you see him do anything wrong *before* you stopped your car?

*A.* Other than not stop and want to talk to us?

*Q.* Well, let me—remove . . .

*A.* Remove his hands from his pants, sir. Other than that, no.

＊　　＊　　＊

*Q.* And you stopped, as I understand it, or it's your testimony that he was stopped because you thought he might be doing something wrong?

*A.* Well, at least to find out.

*Q.* To find out?

*A.* Yes, sir.

words, contribute to a reasonable suspicion calculation, or, by implication, to a finding of probable cause. To find otherwise would deprive citizens of their right to "go on their way" not because of the addition of any articulable or particularized suspicion of imminent criminal activity, but because they exercised their right to the freedom of movement that the Fourth Amendment guarantees. See *Shabaz, supra* at 62.[11]

Moreover, without going into detail, a number of innocent reasons could have explained the position of defendant's hands. Yet, even if defendant placed his hands in his pants to conceal something, that action still would not provide grounds for a finding of probable cause. *United States v Green*, 216 US App DC 329, 333; 670 F2d 1148 (1981),  cited by the majority in *Shabaz*, found that

> the sole fact that individuals may seek to conceal the object of their business from potentially prying eyes, even on the public sidewalk, does not grant the police the power to arrest them. While it is true that persons engaged in illegal transactions will desire to conceal those transactions, the desire for privacy in one's affairs is common among law-abiding persons as well. Thus, the police cannot conclude that merely because an object or a transaction is not openly displayed, it is necessarily illegal. [See also 424 Mich 61.]

This language reflects a common theme in the United States Supreme Court's Fourth Amendment

---

[11] The majority of federal circuit courts to have considered the issue agree that a suspect's refusal to consent to an unreasonable search cannot contribute to a finding of probable cause or reasonable suspicion. See Laser, *Unreasonable suspicion: Relying on refusals to support Terry stops*, 62 U Chi L R 1161 (1995); *United States v White*, 890 F2d 1413, 1417, n 4 (CA 8, 1989); *United States v Wilson*, 953 F2d 116 (CA 4, 1991); *United States v Carter*, 300 US App DC 36; 985 F2d 1095 (1993).

jurisprudence. Justice Harlan's concurring opinion[12] in the landmark *Katz v United States*, 389 US 347, 351; 88 S Ct 507; 19 L Ed 2d 576 (1967), decision, noted that the Fourth Amendment protects individuals from unreasonable governmental intrusion wherever they have a reasonable "expectation of privacy." *Terry* interpreted this language so that the Fourth Amendment's "inestimable right of personal security [would] belong[ ] as much to the citizen on the streets of our cities as to the homeowner closeted in his study to dispose of his secret affairs." 392 US 8-9. The majority in this case impedes this "inestimable right of personal security." Indeed, one must ask, if individuals do not have a legitimate expectation of privacy in their groin, where do they have such an expectation?

A mere eleven years ago in *Shabaz*, a majority of this Court provided the citizens of this state with a suitable framework by which probable cause could be determined. The majority abandons this approach, which requires some explanation. On the other hand, if it wishes to preserve an approach that has worked well, then there is really no good reason for its finding that the previously stated five factors combined to justify the defendant's arrest or the search conducted incident thereto.

In fact, after careful review of the record, it appears that defendant was merely caught with his hands down in his pants, walking in a neighborhood where crimes are often committed, and, possibly, close to those prone to commit them. It should be

---

[12] The Supreme Court gradually came to adopt Justice Harlan's "expectation of privacy" analysis in subsequent cases. The Court now considers the concurring opinion to be the correct statement of law. *Rackas v Illinois*, 439 US 128; 99 S Ct 421; 58 L Ed 2d 387 (1978).

clear that if these circumstances are sufficient to
allow the police to seize a person and subject him to
the type of search defendant was subjected to, very
little restrains the police from general sweeps through
bad neighborhoods to shake down guilty and inno-
cent alike on the hunch that they will, as here, end up
with contraband.

As stated above, this Court was not without enlight-
ening precedent on this point before its decision
today. In *Shabaz*, the Court considered a similar
defendant, accosted under remarkably similar
circumstances:

—The defendant was observed on the street at night in a
high-crime neighborhood;

—He was seen leaving an apartment building wherein the
observing officers had previously made a number of
arrests for concealed-weapons violations and narcotics
offenses;

—After looking in the direction of the unmarked police
vehicle, the defendant was observed "stuffing a [small]
paper bag like under his vest" or "in his pants"; and

—When the officers slowed their vehicle to a stop defend-
ant "took off running." [*Shabaz* at 60.]

A point by point comparison reveals that defendant
was in every regard less suspicious than the insuffi-
ciently suspicious Shabaz. Although also in a high
crime area, defendant was there during the day and
he was not leaving a known drug house; defendant
did not stuff anything in his pants upon seeing police,
he was seen with his hands in his pants when officers
arrived; defendant did not see the police and run
away, he continued walking toward them. Given the
validity of *Shabaz*, it is impossible to conclude that

the officers in this case had reasonable suspicion to seize defendant and, by implication, probable cause to arrest him.

It is unclear, given that defendant has a police record and lives in a poor neighborhood, what the constitution permits him to do, if the simple act of putting his hands down his pants jettisons his constitutional rights.

III

There is much to worry about in a rule that allows a police officer's plain feel to form the basis of a full blown search and seizure. As countless courts have repeatedly noted, expanding the power to stop and frisk inevitably will lead to abuses. No doubt those who will be most hurt by the Court's ruling are those who cannot afford to leave neighborhoods overrun with drugs and the crimes associated with them. These people will be subject to pretextual searches. While we might take comfort in the knowledge that the police may more easily arrest those they suspect of involvement in the drug trade, we should also be mindful that there will be many more searches that turn up nothing more than tootsie rolls and lifesavers. In these cases, law-abiding citizens will have precious few alternatives save, perhaps, putting up with the very abuses against which the framers of the Fourth Amendment tried to protect. I am reminded of Justice Thurgood Marshall's admonition:

> Because the strongest advocates of Fourth Amendment rights are frequently criminals, it is easy to forget that our interpretations of such rights apply to the innocent and the guilty alike. [*United States v Sokolow*, 490 US 1, 11; 109 S Ct 1581; 104 L Ed 2d 1 (1989) (Marshall, J., dissenting).]

The majority justifies its expansive reading of *Dickerson* by pointing out that it limited its holding to the facts presently before the Court. See *ante* at 112-113. Yet, it would be naïve to conclude that this state's lower courts will not read the majority opinion in a way that will allow evidence of drug activity to become evidence against those whose Fourth Amendment rights have been violated, indeed, opening Pandora's box.

In conclusion, I would hold that *Terry* specifically forbids the type of seizure conducted in this case and thereby eliminate the incentive to expand patdowns into general searches for contraband. To the extent that *Dickerson* departs from *Terry's* strict prohibitions, it allows admission of nonweapons evidence found during a patdown if, but only if, the officers conducting the patdown have probable cause to believe that the item they feel is contraband. The item felt in this case, the pill bottle, while containing contraband, was not, in and of itself, contraband. Accordingly, it was impossible for Officer Todd to have probable cause to believe otherwise. His seizure of it, therefore, was illegal. Finally, because the record is completely devoid of credible evidence that would provide an alternate basis for Officer Todd's actions, I would affirm the decision of the Court of Appeals and exclude the evidence that defendant's numerous motions sought to suppress.

LEVIN and CAVANAGH, JJ., concurred with BRICKLEY, C.J.