*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

CLAUDELL TURNER,

        Defendant-Appellant.

FOR PUBLICATION
August 18, 2022

No. 357699
Oakland Circuit Court
LC No. 2021-276333-FH

Before: MARKEY, P.J., and SHAPIRO and PATEL, JJ.

MARKEY, P.J. (*dissenting*).

I respectfully dissent. Defendant was bound over for trial on one count of possession with intent to deliver less than 50 grams of heroin, MCL 333.7401(2)(a)(*iv*), and one count of possession with intent to deliver less than 50 grams of cocaine, MCL 333.7401(2)(a)(*iv*). Defendant moved to suppress evidence that the police had seized upon a search of his person and vehicle. After the trial court denied the motion, defendant filed an application for leave to appeal in this Court, which was denied. *People v Turner*, unpublished order of the Court of Appeals, entered August 18, 2021 (Docket No. 357699). Defendant then appealed to the Michigan Supreme Court. In lieu of granting leave to appeal, our Supreme Court remanded the case to this Court for consideration as on leave granted. *People v Turner*, 969 NW2d 64 (2022). I would conclude that the evidence at issue is admissible and that the trial court did not err by denying the motion to suppress. Accordingly, I would affirm.

## I. BACKGROUND

This case arises from a traffic stop during which police discovered drugs and drug paraphernalia in defendant's possession. At the evidentiary hearing on the motion to suppress, Deputy Kevin Myers testified that an unnamed man approached him and his partner, Detective Hendrick,[1] and told them that he saw a person named "Michael Sullivan" brandish a black pistol.

---

[1] Detective Hendrick's first name does not appear in the lower court record.

According to the anonymous informant (AI),[2] Sullivan had displayed the gun while occupying a newer, gray Jeep Grand Cherokee. The AI described Sullivan as a black male with long dreadlocks and estimated that he was in his 30s. The AI also informed Deputy Myers and Detective Hendrick that Sullivan could be found driving around the south side of Pontiac. Deputy Myers and Detective Hendrick searched for Sullivan on the Law Enforcement Information Network (LEIN). According to Deputy Myers, the LEIN inquiry confirmed the AI's description of Sullivan and showed that Sullivan had a suspended driver's license and a warrant out for his arrest related to a traffic offense.

After performing the LEIN search, Deputy Myers and Detective Hendrick went on patrol on the south side of Pontiac. Deputy Myers testified that "[a] very short time" later, he and Detective Hendrick spotted a newer, gray Jeep Grand Cherokee. To Deputy Myers, it appeared that the Jeep was being driven in excess of the speed limit.[3] A traffic stop was performed. In his testimony, Deputy Myers first indicated that the Jeep was stopped to investigate whether the driver did, in fact, have a firearm in his possession. But, upon being asked whether the civil infraction had anything to do with the traffic stop, Deputy Myers testified that "the initial stop was for the infraction of us estimating him going over the speed limit." Deputy Myers later conceded that it was "more likely" that defendant's Jeep would have been stopped even absent the traffic offense. A camera located on the dashboard of the police cruiser captured what followed.

Deputy Myers and Detective Hendrick walked up to defendant's stopped vehicle. Deputy Myers observed that the driver—defendant—was an African-American male in his 30s with long dreadlocks, which fit the description of Sullivan given by the AI. Deputy Myers asked defendant if he had any identification. From the video footage, it is unclear how defendant responded. About six seconds after Deputy Myers's inquiry regarding defendant's identification, Deputy Myers requested that defendant step out of the Jeep. According to Deputy Myers, during this six-second interval, he observed defendant twice "reach[] down in between the center [console] and his right leg to where [Deputy Myers] couldn't see [defendant's] hand briefly." Deputy Myers testified that this was the reason that he asked defendant to step out of the Jeep. The deputy claimed that at the point that defendant was removed from his vehicle, his identity was unknown to the officers. Deputy Myers indicated that the Jeep was a rental vehicle.

While assisting defendant out of the Jeep, Deputy Myers started to handcuff defendant. Deputy Myers testified that he handcuffed defendant because he had noticed "a foreign object that didn't look right in the crotch area of [defendant's] sweatpants." The object "almost had like a point," and based on the information from the AI, Deputy Myers thought that the object could be the handle of a small caliber pistol or handgun. Detective Brian Wilson arrived on the scene as Deputy Myers was handcuffing defendant. Deputy Myers also noticed a bulge or lump in the area of one of defendant's sweatpants' pockets. Both bulges were suspicious to the deputy, who feared that they could be weapons. After Deputy Myers had defendant out of the Jeep and handcuffed, the deputy started patting down or frisking defendant's sweatpants in an attempt to identify the objects creating the bulges. Deputy Myers then reached into the left pocket of defendant's

---

[2] Deputy Myers clarified that the AI was not a confidential informant.

[3] Deputy Myers stated that the posted speed limit was 25 miles per hour and that defendant "was driving at a high rate of speed." Radar was not used to clock the Jeep's speed.

sweatpants and pulled out a stack or roll of cash from the pocket, which had created the one bulge. Deputy Myers continued to pat-down or frisk defendant in an effort to identify the pointy foreign object creating the bulge in the crotch area of the sweatpants. He testified that he reached into defendant's sweatpants where the bulge was located and felt "some type of hard plastic." Deputy Myers then grabbed and removed the object, which turned out to be a black digital scale. The scale had what appeared to be cocaine residue on it. The officers then continued searching defendant's person. Shortly thereafter, a clear plastic bag fell out of the leg of defendant's sweatpants. The bag contained substances that later tested positive for cocaine and heroin.

Defendant moved to suppress all the evidence seized during the traffic stop, arguing that Deputy Myers and Detective Hendrick did not have reasonable suspicion to conduct the traffic stop and did not have probable cause to arrest defendant. They lacked reasonable suspicion or probable cause, defendant reasoned, because the AI's tip bore no adequate indicia of reliability regarding the contention that a pistol had been brandished. At the evidentiary hearing on the motion to suppress, defense counsel, during summation, began to argue that the information provided by the AI did not give the police justification to stop defendant's Jeep. He then, however, effectively backtracked, stating that "it may give them justification to stop the vehicle, [but] it doesn't give them the justification then to handcuff him and go into his pockets which is what the officer did in this case."

The trial court denied defendant's motion in a written opinion and order. The trial court concluded that the traffic stop and subsequent search were constitutional under *Terry v Ohio*, 392 US 1; 88 S Ct 1868; 20 L Ed 2d 889 (1968). The trial court reasoned that Deputy Myers and Detective Hendrick had reasonable suspicion to conduct a traffic stop because (1) Deputy Myers observed defendant driving over the speed limit, and (2) Deputy Myers spotted a gray Jeep Grand Cherokee in the same area that the AI said such a vehicle would be located. The trial court did state that the "traffic stop was reasonable" on the basis that defendant was speeding. The trial court explained that once defendant was stopped, Deputy Myers had the authority to perform a limited pat-down search of defendant because the deputy had witnessed defendant making furtive movements in the vehicle, observed what appeared to be a gun in defendant's sweatpants, and had believed that defendant matched the AI's description of Sullivan. This interlocutory appeal followed.

## II. ANALYSIS

### A. STANDARD OF REVIEW

A trial court's findings at a suppression hearing are reviewed for clear error. *People v Williams*, 472 Mich 308, 313; 696 NW2d 636 (2005). Clear error occurs when the reviewing court is definitely and firmly convinced that the trial court made a mistake. *People v Johnson*, 502 Mich 541, 565; 918 NW2d 676 (2018).[4] "But the application of constitutional standards regarding

---

[4] There is no indication in the transcript of the suppression hearing or in the trial court's written ruling that the court took into consideration testimony elicited at the preliminary examination, nor that the court made any determination that preliminary-examination testimony would be

searches and seizures to essentially uncontested facts is entitled to less deference; for this reason, we review de novo the trial court's ultimate ruling on the motion to suppress." *Williams*, 472 Mich at 313. This Court reviews de novo whether the Fourth Amendment was violated by the police and whether the exclusionary rule is applicable. *People v Anthony*, 327 Mich App 24, 32; 932 NW2d 202 (2019).

## B.  GENERAL CONSTITUTIONAL PRINCIPLES

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." US Const, Am IV. "The Fourth Amendment of the United States Constitution—like Article 1, § 11 of the 1963 Michigan Constitution,[5] whose protections have been construed as coextensive with its federal counterpart—protects against unreasonable searches and seizures." *People v Mead*, 503 Mich 205, 212; 931 NW2d 557 (2019) (citation omitted). Under the Fourth Amendment, searches conducted without a warrant are per se unreasonable, subject only to a few specifically established and well-delineated exceptions, including, but not limited to, automobile searches and seizures and stop-and-frisk detentions and searches. *People v Davis*, 442 Mich 1, 10; 497 NW2d 910 (1993). The touchstone of any Fourth Amendment analysis is reasonableness, and reasonableness is measured by examination of the totality of the circumstances. *Williams*, 472 Mich at 314.

In *People v Jenkins*, 472 Mich 26, 32; 691 NW2d 759 (2005), our Supreme Court discussed *Terry* stops, explaining:

> Under certain circumstances, a police officer may approach and temporarily detain a person for the purpose of investigating possible criminal behavior even though there is no probable cause to support an arrest. A brief detention does not violate the Fourth Amendment if the officer has a reasonably articulable suspicion that criminal activity is afoot. Whether an officer has a reasonable suspicion to make such an investigatory stop is determined case by case, on the basis of an analysis of the totality of the facts and circumstances. A determination regarding whether a reasonable suspicion exists must be based on commonsense judgments and inferences about human behavior. [Citations and quotation marks omitted.]

---

considered for purposes of its ruling. See MCR 6.110(D)(2); *People v Kaufman*, 457 Mich 266, 275-276; 577 NW2d 466 (1998).

[5] Const 1963, art 1, § 11, provides, in part:

> The person, houses, papers, possessions, electronic data, and electronic communications of every person shall be secure from unreasonable searches and seizures. No warrant to search any place or to seize any person or things or to access electronic data or electronic communications shall issue without describing them, nor without probable cause, supported by oath or affirmation. . . . .

Reasonable suspicion requires something more than an inchoate or unparticularized hunch or suspicion, but the level of suspicion is less than that needed to establish probable cause. *People v Champion*, 452 Mich 92, 98; 549 NW2d 849 (1996). The *Champion* Court further elaborated:

> A valid investigatory stop must be justified at its inception and must be reasonably related in scope to the circumstances that justified interference by the police with a person's security. Justification must be based on an objective manifestation that the person stopped was or was about to be engaged in criminal activity as judged by those versed in the field of law enforcement when viewed under the totality of the circumstances. The detaining officer must have had a particularized and objective basis for the suspicion of criminal activity.

> An officer who makes a valid investigatory stop may perform a limited patdown search for weapons if the officer has reasonable suspicion that the individual stopped for questioning is armed and thus poses a danger to the officer. *Terry* strictly limits the permissible scope of a patdown search to that reasonably designed to discover guns, knives, clubs, or other hidden instruments that could be used to assault an officer. [*Id.* at 98-99.]

## C. DISCUSSION

I will analyze this case in chronological order as events developed at the time of the traffic stop, pausing at pertinent stages to address legal arguments posed by defendant. First, with respect to the officers' actions in making the traffic stop, defendant states in his brief on appeal that "in the lower court here, [defendant] made no complaint about the stop of his vehicle." Defendant then moves on with his appellate argument; however, he later appears to return to the matter when he discusses the decision by the United States Supreme Court in *Florida v JL*, 529 US 266, 268; 120 S Ct 1375; 146 L Ed 2d 254 (2000), wherein the Court held that an anonymous tip that a person was carrying a gun was, without more, insufficient to justify a police officer's *Terry* stop and frisk of the identified individual.[6] Defendant, after examining *JL* in detail, then appears to implicitly argue in vague, cursory fashion that there was no justification for the traffic stop in this case. This argument is not adequately briefed. See *Mudge v Macomb Co*, 458 Mich 87, 105; 580 NW2d 845 (1998). An argument can also be made that the issue was waived when defendant, at the suppression hearing, indicated that the AI's information may have given the police justification to stop defendant's Jeep. See *People v Carter*, 462 Mich 206, 215; 612 NW2d 144 (2000) (waiver is the intentional relinquishment or abandonment of a known right). Regardless, defendant makes no argument whatsoever that stopping his vehicle for an alleged civil infraction, i.e., speeding, was improper. Even though a traffic stop would likely have occurred regardless of the traffic violation,

---

[6] The Supreme Court observed that unlike tips from known informants whose reputation can be assessed, an anonymous tip seldom demonstrates the informant's veracity or basis of knowledge. *JL*, 529 US at 270.

Deputy Myers did testify that defendant was stopped because he was speeding, and the trial court did rule that the alleged civil infraction justified the stop.[7] "When an appellant fails to dispute the basis of a lower court's ruling, we need not even consider granting the relief being sought by the appellant." *Denhof v Challa*, 311 Mich App 499, 521; 876 NW2d 266 (2015). Therefore, I will proceed with my analysis on the basis that the traffic stop was proper.

Next, Deputy Myers asked defendant if he had any identification. Defendant does not challenge this conduct or inquiry by Deputy Myers. The deputy then asked defendant to exit the Jeep because the deputy had observed defendant twice making furtive movements inside the vehicle. Again, defendant does not challenge the decision by Deputy Myers to essentially order defendant to step out of the Jeep. Indeed, defendant acknowledges that it was an appropriate request. And I note that there is nothing unconstitutional about an officer's asking a driver who has been the subject of a proper traffic stop to produce identification and to temporarily exit their car, even without furtive gestures. See *Pennsylvania v Mimms*, 434 US 106, 110-111; 98 S Ct 330; 54 L Ed 2d 331 (1977).

Deputy Myers immediately handcuffed defendant as the deputy assisted defendant out of the Jeep. Defendant claims that this action constituted an arrest which was not supported by the required demonstration of probable cause. Defendant asserts that reasonable suspicion does not suffice to make an arrest. In *People v Green*, 260 Mich App 392, 397-398; 677 NW2d 363 (2004), overruled in part on other grounds by *People v Anstey*, 476 Mich 436, 447 n 9 (2006), this Court observed:

> Defendant's argument is premised on the faulty claim that he was under arrest as soon as the officers approached him and tried to handcuff him. In this case, the officers' initial contact with defendant was for the purpose of attempting to investigate the complaint made by Ford security. The contact was proper because the police were acting upon a complaint of possible criminal conduct and were trying to determine whether a crime was committed or whether defendant was in need of assistance. In addition to the initial contact being within the proper authority of the police, the police conduct in trying to secure defendant during the investigation was also proper and was not an unreasonable seizure under the Fourth Amendment. A defendant's restraint is not necessarily an arrest. In *People v Zuccarini*, 172 Mich App 11, 14; 431 NW2d 446 (1988), the defendant was handcuffed during the execution of a search warrant. The officer who handcuffed him indicated that the restraint was mainly for the purpose of safety. This Court determined that the handcuffing was a reasonable, limited intrusion on the defendant's liberty under circumstances where violence could arise and the risk of harm to the police and others needed to be minimized. *Id*. In *People v Sangster*, 123

---

[7] A traffic stop is generally not unlawful and does not violate the Fourth Amendment if the officer conducting the stop has probable cause or a reasonable and articulable suspicion to believe that a violation of the Motor Vehicle Code had been committed or was occurring. *People v Davis*, 250 Mich App 357, 363; 649 NW2d 94 (2002); *People v Williams*, 236 Mich App 610, 612; 601 NW2d 138 (1999).

Mich App 101, 104; 333 NW2d 180 (1983), this Court agreed that protective measures, such as an officer drawing his weapon, do not transform a stop into an arrest. [Citation omitted.]

Here, taking into consideration (1) defendant's furtive movements while still inside the Jeep, (2) the information gleaned from the AI that a person fitting defendant's description driving around the south side of Pontiac in a Jeep Cherokee had brandished a gun, and (3) Deputy Myers's observation of what appeared to be a pointy foreign object in defendant's sweatpants that the deputy suspected could be a handgun, along with a second unidentified bulge in the sweatpants, I conclude that Deputy Myers had good reason to handcuff defendant, not to effectuate an arrest, but to maximize the safety of all and to minimize the risk to the officers.[8]

Defendant argues that anonymous sources of information cannot establish probable cause to arrest or search. First, defendant was handcuffed to protect the police officers; this did not require probable cause. And he was not arrested then or at any point for anything related to the AI's information. The AI said nothing about illegal narcotics. Additionally, defendant was placed in handcuffs primarily because of the bulges in his sweatpants which were observed after he engaged in furtive movements in the Jeep. Those facts supported handcuffing defendant even without considering the information the AI provided.

Immediately after defendant was handcuffed, Deputy Myers proceeded to pat-down or frisk defendant around the crotch and pocket areas of his sweatpants in light of the two bulges, one of which the deputy described as being a pointy foreign object. Deputy Myers then reached into a pocket where a bulge was present and retrieved the roll of cash. He next felt "some type of hard plastic" upon reaching into defendant's sweatpants in his effort to identify the object creating the second bulge. The object turned out to be a digital scale that appeared to be caked with cocaine residue. Deputy Myers seized the scale. On appeal, defendant concedes that Deputy Myers "had the authority, if his testimony is to be believed, to pat-down [defendant's] outer clothing."[9] Defendant complains, however, that Deputy Myers never articulated a belief that the "hard plastic" was a handgun, as was necessary for the deputy to actually reach into defendant's pants and pull out the concealed object. Defendant discusses and distinguishes the *Mimms* opinion issued by the United States Supreme Court.

In *Mimms*, 434 US at 107, a police officer stopped a vehicle with an expired license plate with the intent to issue a traffic summons. Although the officer had no reason to suspect the driver of "foul play" and there was nothing unusual or suspicious about his behavior, *id.* at 109, the officer ordered him to exit the vehicle and produce his owner's card and operator's license, *id.* at 107. The driver alighted from the vehicle, and the officer noticed "a large bulge" under the driver's

---

[8] I decline to address the prosecution's argument that because the police had probable cause to arrest Sullivan on the basis of Sullivan's suspended driver's license and the warrant for his arrest, and because the police were under the mistaken belief that defendant was Sullivan when he was handcuffed, the "arrest" of defendant could not amount to a constitutional violation.

[9] I note that deference is given to a trial court's assessment of the credibility of witnesses at an evidentiary suppression hearing. *People v Ryan*, 295 Mich App 388, 396; 819 NW2d 55 (2012).

sports jacket. *Id.* The officer frisked him and discovered a loaded revolver in his waistband. *Id.* After resolving some other issues, the Supreme Court ruled:

> There remains the second question of the propriety of the search once the bulge in the jacket was observed. We have as little doubt on this point as on the first; the answer is controlled by *Terry* . . . . In that case we thought the officer justified in conducting a limited search for weapons once he had reasonably concluded that the person whom he had legitimately stopped might be armed and presently dangerous. Under the standard enunciated in that case—whether the facts available to the officer at the moment of the seizure or the search warrant a man of reasonable caution in the belief that the action taken was appropriate—there is little question the officer was justified. The bulge in the jacket permitted the officer to conclude that Mimms was armed and thus posed a serious and present danger to the safety of the officer. In these circumstances, any man of "reasonable caution" would likely have conducted the "pat down." [*Id.* at 111-112 (quotation marks omitted).]

In the instant case, Deputy Myers observed a pointy bulge in defendant's sweatpants. I conclude, and defendant concedes, that there was nothing unconstitutional about Deputy Myers's conduct in frisking or patting defendant's sweatpants. Although not entirely clear, defendant also appears to acknowledge, and I would agree, that there was nothing unconstitutional about Deputy Myers's reaching into defendant's sweatpants and touching the object that to the deputy felt like hard plastic. Defendant's argument is that Deputy Myers failed to voice a belief, upon having touched the object, that it could be a gun or a weapon and that the deputy was thus not free to look inside defendant's sweatpants and seize the scale. While on the stand, Deputy Myers specifically articulated:

> The object it almost had like a point, like again my thought process being the information we were given, cause I thought it was a small caliber pistol like the handle of it, or the like the butt of the pistol itself or handgun.

Deputy Myers apparently came to this conclusion before actually touching the object, but nothing in his testimony indicated that his fears were alleviated when he touched "some type of hard plastic," such that he could discern that it was not a weapon and should remain in place in the crotch of defendant's sweatpants.[10] I would hold that there was nothing unconstitutional about Deputy Myers's conduct in viewing and seizing the object in defendant's sweatpants, i.e., the scale

---

[10] I note that my view is not changed by the fact that part of the reason Deputy Myers believed the object might be a gun was because of the AI's information. Assuming that *JL*, 529 US 266, governs this case and that the AI's information could not be used to establish reasonable suspicion to make the traffic stop and to frisk defendant, the traffic stop was nevertheless justified by the alleged speeding infraction, and the frisk for weapons was nonetheless justified by the furtive movements in the Jeep and the bulges in defendant's sweatpants. See *Mimms*, 434 Mich at 111-112. This is not at all a situation in which the AI's information served as the sole or primary basis to frisk defendant and to reach into his sweatpants and retrieve the object.

caked with what appeared to be cocaine residue, at which point there existed probable cause to effectuate defendant's arrest and continue the search. The baggie filled with cocaine and heroin then fell out of defendant's sweatpants, further cementing probable cause to arrest defendant and search his vehicle.

The majority concludes that viewing and seizing the scale in defendant's sweatpants was unconstitutional, reasoning as follows:

> [Deputy] Myers did not testify that he thought the hard plastic was a gun or other type of weapon *after he felt it*. He simply did not know what it was. He was only able to identify the object after he pulled open the waistband of Turner's pants and looked inside his underwear.

> [We] conclude that, under the totality of the circumstances, [Deputy] Myers did not have probable cause to believe that either of the objects that he felt were weapons. [Deputy] Myers'[s] general exploration of the interior of Turner's pants exceeded the scope of the *Terry* patdown.

Although defendant himself makes no mention of the plain-feel exception to the warrant requirement, the majority relies on the exception. Under the plain-feel exception adopted by the United States Supreme Court in *Minnesota v Dickerson*, 508 US 366; 113 S Ct 2130; 124 L Ed 2d 334 (1993), the police are allowed to make a warrantless seizure of an object felt during a legitimate pat-down search for weapons when the identity of the object is immediately apparent and the officer has probable cause to believe that the object is contraband. *People v Custer*, 465 Mich 319, 331; 630 NW2d 870 (2001); *Champion*, 452 Mich at 100-101.[11] "Specifically, an object felt during an authorized patdown search may be seized without a warrant if the item's incriminating character is immediately apparent, i.e., if the officer develops probable cause to believe that the item felt is contraband before going beyond the legitimate scope of the patdown search." *Champion*, 452 Mich at 105-106. In *Dickerson*, 508 US at 371, the Court "resolve[d] a conflict among the state and federal courts over whether contraband *detected through the sense of touch* during a patdown search may be admitted into evidence." (Emphasis added.) The Court noted that the issue "presented . . . is whether police officers may seize *nonthreatening* contraband detected during a protective patdown search of the sort permitted by *Terry*." (Emphasis added.)

I do not believe that the plain-feel exception to the warrant requirement was implicated in this case under the circumstances that developed after the traffic stop. The majority's ruling ignores Deputy Myers's *visual observation* of a bulge that reflected the presence of a pointy

---

[11] The *Dickerson* Court explained:

> If a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity immediately apparent, there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons; if the object is contraband, its warrantless seizure would be justified by the same practical considerations that inhere in the plain-view context. [*Dickerson*, 508 US at 375-376.]

foreign object in defendant's sweatpants, which the deputy reasonably believed was a weapon. In this sense, the case is no different than *Mimms*, which addressed "the propriety of [a] search once the bulge in the jacket *was observed*." *Mimms*, 434 US at 111 (emphasis added). Again, the *Mimms* Court held that "[t]he bulge in the jacket permitted the officer to conclude that Mimms was armed and thus posed a serious and present danger to the safety of the officer." *Id.* at 112. In this case, it was not a "sense of touch" that led to safety concerns by Deputy Myers; it was his observation of the pointy foreign object concealed by defendant's sweatpants. Moreover, Deputy Myers was still in the process of assessing whether he was confronting a threatening or nonthreatening object when he peered into defendant's sweatpants and seized the scale. Stated otherwise, he was acting within "the legitimate scope of the patdown search[,]" *Champion*, 452 Mich at 105-106, for purposes of determining whether defendant was indeed armed with a weapon. The fact that Deputy Myers, after observing the pointy bulge, felt "some type of hard plastic" did not suggest that a threat was nonexistent, and even though the deputy did not specifically state that he still remained concerned about a weapon, it is clear from his testimony that identifying the pointy object was imperative to ruling out the presence of a weapon. Under the majority's analysis, had Deputy Myers not touched or felt the scale and instead immediately reached in and grabbed it in order to identify the foreign object for safety purposes, the majority, ostensibly, would have found no constitutional violation. Touching the unknown hard object should not change the analysis.[12]

In sum, I conclude that the trial court did not err by denying defendant's motion to suppress the evidence seized by the police. Accordingly, I dissent.

/s/ Jane E. Markey

---

[12] The plain-feel exception to the warrant requirement focuses on whether an officer's touch immediately indicated contraband or not, but the majority is using the exception in a manner that negates an officer's effort to determine whether an initial plainly-observed bulge is a weapon, which, in my view, is inconsistent with the dictates of *Mimms*.