*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

GARY MANDELL HOLT,

Defendant-Appellant.

UNPUBLISHED
August 22, 2025
1:40 PM

No. 368099
Wayne Circuit Court
LC No. 21-000696-01-FC

Before: REDFORD, P.J., and RIORDAN and BAZZI, JJ.

PER CURIAM.

Defendant, Gary Mandell Holt, appeals as of right his August 4, 2023 jury trial convictions for one count of felony murder, MCL 750.316(1)(b), one count of armed robbery, MCL 750.529, one count of being a felon in possession of a firearm (felon-in-possession), MCL 750.224f, and three counts of carrying a firearm during the commission of a felony (felony-firearm), MCL 750.227b.[1] Holt was sentenced as a fourth-offense habitual offender, MCL 769.12, to concurrent terms of life without parole for felony murder, 75 to 150 years' incarceration for armed robbery, and 38 to 60 months' imprisonment for felon-in-possession, all to be served consecutively to a term of five years' incarceration for each felony-firearm. We affirm.

---

[1] Holt was charged with one count of first-degree murder, MCL 750.316, one count of felony murder, one count of armed robbery, one count of felon-in-possession, and four counts of felony-firearm. However, the jury found Holt guilty of the lesser offense of second-degree murder, MCL 750.317, and the jury acquitted Holt as to the felony-firearm charge associated with the second-degree murder offense, but he was convicted of the other counts as noted. On August 23, 2023, the trial court vacated Holt's second-degree murder conviction explaining that "under the law an individual cannot be convicted of a homicide or a murder where the victim is the same person on two different counts."

# I. FACTUAL BACKGROUND

This case arises out of the armed robbery and fatal shooting of decedent, Frank Brown, while decedent was cleaning a car in a driveway in Detroit, Michigan. On June 19, 2020, decedent and his girlfriend, Michelle Burks, went to a car wash to have the vehicle of Michelle's mother, Mildred Burks, serviced. Decedent and Michelle returned to Michelle's residence located in Asbury Park, where numerous family members, including Mildred, were home. Michelle entered the house but decedent remained in the driveway to clean the inside of Mildred's car. Shortly thereafter, Michelle, Mildred, and Michelle's sister, Deandra Burks, heard multiple gunshots sounding from the direction of the front door. After stepping outside, Michelle saw a Black man, dressed in all black clothing and wearing a full-coverage black mask, approach the premises and subsequently flee in a gray sport utility vehicle (SUV). Deandra, in addition to a number of Asbury Park residents, testified that they heard gunshots and observed a gray SUV fleeing through the alleyway toward Grand River Avenue. Decedent was bleeding, leaned against Mildred's car in the driveway, and his glasses, a pair of prescription Cartier glasses, were missing. Emergency medical services (EMS) and law enforcement arrived at the scene, and EMS transported decedent to a local hospital, where he succumbed to the two gunshot wounds.

Detective Douglas Williams, a detective with the Detroit Police Department, was responsible for overseeing the underlying investigation. Detective Williams was able to acquire footage from surveillance cameras located at Grand River Avenue, and the cameras captured the alleyway where the vehicle associated with the shooting allegedly sped toward. Detective Williams testified that after reviewing the pertinent videos, he shared the footage with an audio video extraction team specialist, who was able to pause and enlarge the surveillance footage to obtain the license plate number of the depicted fleeing vehicle, which was a 2020 silver Kia Sorrento. Detective Williams subsequently entered the license plate number into the law enforcement information network (LEIN), which indicated that the car belonged to a car rental company. The car rental company records indicated that Holt rented the 2020 silver Kia Sorrento depicted in the surveillance footage between June 15, 2020, and June 21, 2020, and Holt exchanged the aforementioned vehicle for a 2020 white Toyota RAV4 on June 21, 2020, two days after the underlying incident.

On June 25, 2020, multiple officers were dispatched to the Alden Towers apartment complex, to locate and apprehend Holt because the 2020 white Toyota RAV4 rented by Holt was seen in the apartment complex parking lot; it was still daylight outside. Holt was seen approaching the rental vehicle in the parking lot and was subsequently detained after fleeing on foot. A cell phone was lying on the ground near Holt's right hand, which was recovered by law enforcement. While standing outside the vehicle near the front passenger side, Sergeant Brent Rodak, a sergeant with the Detroit Police Department, saw a firearm positioned in the driver's side-door pocket and subsequently seized it. A subsequent search of the Toyota RAV4 revealed a black knit facemask in the rear cargo area of the car, in addition to eight shoeboxes, various bags, and a pair of Adidas pants. The retrieved cell phone contained photographs of decedent's glasses captured on the day of the shooting, and cell tower mapping placed the device within a mile of the Asbury Park residence minutes after the incident.

Following a five-day jury trial, Holt was convicted and sentenced as provided earlier. This appeal ensued.

## II. IDENTIFICATION

Holt argues that there was insufficient evidence to identify him as the perpetrator of the subject offenses. We disagree.

This Court reviews de novo a challenge to the sufficiency of the evidence. *People v Byczek*, 337 Mich App 173, 182; 976 NW2d 7 (2021). In evaluating a defendant's claim concerning the sufficiency of the evidence, this Court reviews the evidence in a light most favorable to the prosecution to discern whether any trier of fact could find the essential elements of the crime were proven beyond a reasonable doubt. *People v Robinson*, 475 Mich 1, 5; 715 NW2d 44 (2006). "Circumstantial evidence and reasonable inferences arising therefrom may constitute proof of the elements of the crime." *People v Head*, 323 Mich App 526, 532; 917 NW2d 752 (2018). When reviewing a sufficiency claim on appeal, we "must defer to the fact-finder by drawing all reasonable inferences and resolving credibility conflicts in support of the jury verdict." *People v Schumacher*, 276 Mich App 165, 167; 740 NW2d 534 (2007).

Identity is a vital element in a criminal prosecution. *People v Galloway*, 335 Mich App 629, 641; 967 NW2d 908 (2020). The prosecution must prove the identity of the defendant as the perpetrator of a charged offense beyond a reasonable doubt. *People v Posey*, 512 Mich 317, 323; 1 NW3d 101 (2023). Positive identification by a witness or circumstantial evidence and reasonable inferences arising from it may be sufficient to support a conviction. *People v Davis*, 241 Mich App 697, 700; 617 NW2d 381 (2000). "The credibility of identification testimony is a question for the trier of fact that we do not resolve anew." *Id*.

Viewed in a light most favorable to the prosecution, the evidence was sufficient to establish Holt's identity as the person responsible for the armed robbery and shooting of decedent. Multiple witnesses testified that they heard gunshots and saw a Black man, dressed in all black clothing and wearing a full-coverage black mask, approach the premises and subsequently flee in a gray SUV. The footage recovered from the surveillance cameras depicted a person walking down Asbury Park toward Grand River Avenue at the time and date of the incident, quickly approaching the Asbury residence, and a gray SUV fleeing through the alleyway, which several witnesses identified as the vehicle's path of escape. No other vehicles matching the witnesses' description were captured in the surveillance footage. Law enforcement was able to ascertain the vehicle's license plate number after digitally enhancing the surveillance footage, which revealed that the gray SUV depicted was a 2020 silver Kia Sorrento owned by a car rental company. The certified car rental company records provided that Holt was renting the Kia Sorrento on the day of the shooting and he exchanged the aforementioned vehicle for a 2020 white Toyota RAV4.

The record further indicated that the cell phone recovered from Holt at the time of his arrest contained photographs depicting decedent's glasses and a full-coverage black mask taken after the incident. Moreover, the phone number associated with the device matched the number Holt provided to the car rental company. The cell tower mapping of the cell phone revealed that the device was within a mile of the Asbury Park residence immediately after the shooting, and the "pie-shaped area" representing the cell phone's location was only "a couple minutes" away from the Asbury Park residence. Regarding decedent's stolen glasses, multiple witnesses testified that decedent exclaimed, "They took my glasses," immediately after he was shot, and that his glasses were missing following the incident. This evidence was further corroborated by a witness who

testified that he purchased decedent's glasses in 2020 from an unknown individual, and later sold the glasses to a pawn shop. Additionally, Detective Williams testified that he entered the serial number of decedent's glasses into the LEIN, which revealed that the glasses were sold at a pawn shop, and he subsequently recovered the glasses therein.

The prosecution additionally presented evidence that the firearm recovered from the rented Toyota RAV4 matched the shell casings found at the shooting scene, and the mask and pants recovered during the vehicle search corresponded to the witnesses' description of the perpetrator. While Holt contends that the prosecution failed to present any direct eyewitness identification testimony or forensic evidence indicating Holt was responsible for the underlying incident, this Court has expressly provided that circumstantial evidence is adequate to establish identity. See *People v Bass*, 317 Mich App 241, 265; 893 NW2d 140 (2016) (stating, "Given the circumstantial evidence and the inferences fairly drawn from it, there was sufficient evidence for a rational trier of fact to conclude that defendant was the perpetrator of the charged offenses"). Moreover, any discrepancies regarding defendant's appearance, the vehicle associated with fleeing the scene of the shooting, or the car rental entity's records were issues solely for the jury to address. See *People v Kenny*, 332 Mich App 394, 403; 956 NW2d 562 (2020) (providing, "A jury, and not an appellate court, observes the witnesses and listens to their testimony; therefore, an appellate court must not interfere with the jury's role in assessing the weight of the evidence and the credibility of the witnesses"). Ultimately, there was a plethora of circumstantial evidence to enable the trier of fact to find beyond a reasonable doubt that Holt was the perpetrator of the subject offenses.

### III. MOTION TO SUPPRESS

Holt argues that the evidence recovered from his rental car[2] should be suppressed because it was the product of an unconstitutional search.[3] We disagree.

This Court reviews for clear error a trial court's factual findings in a ruling on a motion to suppress evidence. A trial court's factual findings are clearly erroneous when this Court is left with a definite and firm conviction that the trial court made a mistake. The decision whether to admit evidence is within a trial court's discretion. This Court reverses it only where there has been an abuse of discretion. A trial court abuses its discretion when it selects an outcome that falls outside the range of reasonable and principled outcomes. To the extent that a trial court's ruling on a motion to suppress involves an interpretation of the law or the application of a constitutional standard to uncontested facts, our review is de novo.

---

[2] All references to a rental vehicle herein solely pertain to the 2020 white Toyota RAV4 in Holt's possession at the time of his apprehension.

[3] Holt previously applied for leave to appeal in this Court regarding the trial court's order denying his motion to suppress the evidence arising out of the search of his rental car. But this Court denied the application. See *People v Holt*, unpublished order of the Court of Appeals, entered November 1, 2022 (Docket No. 363119).

[*People v Clark*, 330 Mich App 392, 415; 948 NW2d 604 (2019) (quotation marks and citations omitted).

The United States and Michigan Constitutions both guarantee a right to be free from unreasonable searches and seizures. US Const, Am IV; Const 1963, art 1, § 11; *Herring v United States*, 555 US 135, 136; 129 S Ct 695; 172 L Ed 2d 496 (2009); *People v Slaughter*, 489 Mich 302, 310-311; 803 NW2d 171 (2011). "Michigan's constitutional prohibition against unreasonable searches and seizures is to be construed to provide the same protection as that secured by the Fourth Amendment of the United States Constitution, absent compelling reason to impose a different interpretation." *People v Bolduc*, 263 Mich App 430, 437 n 9; 688 NW2d 316 (2004).

"[A] search for purposes of the Fourth Amendment occurs when the government intrudes on an individual's reasonable, or justifiable, expectation of privacy." *People v Taylor*, 253 Mich App 399, 404; 655 NW2d 291 (2002). "In general, searches conducted without both a warrant and probable cause to believe evidence of wrongdoing might be located at the place searched are unreasonable per se." *Lavigne v Forshee*, 307 Mich App 530, 537; 861 NW2d 635 (2014). Moreover, "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Arizona v Gant*, 556 US 332, 338; 129 S Ct 1710; 173 L Ed 2d 485 (2009), citing *Katz v United States*, 389 US 347, 357; 88 S Ct 507; 19 L Ed 2d 576 (1967). "The exclusionary rule is a judicially created remedy that originated as a means to protect the Fourth Amendment right of citizens to be free from unreasonable searches and seizures." *People v Hawkins*, 468 Mich 488, 498; 668 NW2d 602 (2003). In general, this rule prohibits the admission of evidence that was acquired during an unreasonable search. *Id*. at 498-499.

"It is the government's burden to prove that an exception to the warrant requirement exists." *People v Armstrong*, ___ Mich ___, ___; ___ NW3d ___ (2025) (Docket No. 165233); slip op at 6. One such exception is the plain-view doctrine, "which allows police officers to seize, without a warrant, items in plain view if the officers are lawfully in a position from which they view the item, and if the item's incriminating character is immediately apparent." *People v Champion*, 452 Mich 92, 101; 549 NW2d 849 (1996).

During the evidentiary hearing, Sergeant Rodak testified that on June 25, 2020, he, in conjunction with other members of law enforcement, were deployed to detain Holt in the Alden Towers parking lot because Holt's latest rental vehicle, a 2020 white Toyota RAV4, was seen in the apartment complex's parking lot. Sergeant Rodak was aware that Holt was a suspect in the underlying murder investigation and a firearm was used to commit the offense. After learning that Holt was detained as he was approaching the rental vehicle in the Alden Towers parking lot, Sergeant Rodak proceeded to the parking lot. Sergeant Rodak advanced toward the Toyota RAV4, and he was "[j]ust looking at the vehicle itself, looking inside the windows." Sergeant Rodak asserted, "When I was looking through the front passenger's window, I could see a blue steel automatic in the side pocket of the driver's door."

Sergeant Rodak ordered the evidence technicians to document his findings because "[w]e don't wear body cams, so I wanted to have it document, photographed." After the evidence technicians captured the necessary photographs, Sergeant Rodak recovered the firearm, and he

"conveyed it down to Detroit Police headquarters." Neither Sergeant Rodak nor any other officer on the premises requested a warrant to search the vehicle or to arrest Holt. Law enforcement acquired the keys to the vehicle from Holt, but Sergeant Rodak was unsure whether the car was locked or unlocked before the subject search as Sergeant Rodak "just opened the door." The vehicle was subsequently impounded.

The record indicates Sergeant Rodak was lawfully near Holt's rental vehicle, overseeing his apprehension, when Sergeant Rodak saw the firearm in plain view. While Holt contends that the trial court failed to consider whether law enforcement was legitimately present in the parking lot, which he claims was gated private property, the record contains no suggestion that the officers were required to bypass a gate or faced any obstacles in accessing the premises, despite the presence of numerous officers in the vicinity. See *People v Jones*, 279 Mich App 86, 95; 755 NW2d 224 (2008) (concluding "the canine was lawfully present at the front door of defendant's residence when it detected the presence of contraband" because the "record contains no evidence that the canine team crossed any obstructions, such as a gate or fence, in order to reach the front door, or that the property contained any signs forbidding people from entering the property").

Furthermore, Holt did not maintain a reasonable expectation of privacy in the parking lot considering it was a common area shared with other tenants, guests, and employees of the apartment complex, and the firearm was plainly visible through the front passenger window to any observer. See *Texas v Brown*, 460 US 730, 739-740; 103 S Ct 1535; 75 L Ed 2d 502 (1983) (stating, "There is no legitimate expectation of privacy shielding that portion of the interior of an automobile which may be viewed from outside the vehicle by either inquisitive passersby or diligent police officers"); see also *United States v Correa*, 653 F3d 187, 191 (CA 3, 2011) (concluding, "Given the plethora of individuals who could access the common areas of the locked multi-unit apartment building and [the defendant's] inability to control these areas," defendant lacked a reasonable expectation of privacy in the building's common areas). Additionally, "The law recognizes that expectations of privacy are diminished in an automobile when compared, for example, to a home." *People v Mead*, 503 Mich 205, 215 n 3; 931 NW2d 557 (2019).

Holt further argues that the incriminating nature of the firearm was not immediately apparent. However, in light of Holt's status a suspect in a firearm-related murder investigation, and the established connection between him and the rental vehicle, the presence of a firearm inside the car constituted incriminating evidence under the probable-cause standard. See *Horton v California*, 496 US 128, 142; 110 S Ct 2301; 110 L Ed 2d 112 (1990) (holding the officer had probable cause to believe that the weapons and handguns in plain view had been used in the armed robbery he was investigating). "[P]robable cause is the level of suspicion required in the plain view context." *Champion*, 452 Mich at 103. Absolute certainty that the firearm was the murder weapon was not required. See *id*. at 106-108 (explaining that knowledge or near certainty is not required, rather, in the plain-view context, the "degree of certainty required for plain feel seizures, just as for plain view seizures, is probable cause"). Moreover, no manipulation of the vehicle or firearm was necessary to discern the firearm's incriminating character. Cf. *id*. at 103-104 (stating, "The 'immediately apparent' language was not satisfied because the officer could not form probable cause upon viewing the object, but had to manipulate the object, going beyond the authorized plain view search"). In this matter, the "incriminating character" of the evidence was apparent under the circumstances.

Holt additionally contends because there was no warrant to search the vehicle itself, the trial court should have suppressed the firearm because entering the vehicle was itself unlawful absent a warrant. But the automobile exception to the warrant requirement provides otherwise. The automobile exception provides, "If a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment . . . permits police to search the vehicle without more." *Pennsylvania v Labron*, 518 US 938, 940; 116 S Ct 2485; 135 L Ed 2d 1031 (1996). "Probable cause means that there is a 'substantial basis' for inferring a 'fair probability' that contraband or evidence of a crime will be found in a particular place." *Armstrong*, ___ Mich at ___; slip op at 8 (quotation marks and citation omitted).

While the exception is premised on the inherent mobility of vehicles, this Court has explained that the automobile exception is applicable even when the particular vehicle at issue is itself not readily mobile. As this Court opined in *People v Carter*, 250 Mich App 510, 514-517; 655 NW2d 236 (2002), addressing the search of a disabled and burned vehicle:

> First, we disagree with the factual premise that defendant's vehicle was immobile. Although the motor of the automobile was inoperable after the fire, the vehicle was capable of mobility. During the interval between the first and second searches, defendant could have moved the automobile by summoning a tow truck. Defendant's automobile could have been hauled to any location while the police were preoccupied in court seeking a search warrant.

> More fundamentally, application of the well-established automobile exception does not rise or fall depending on the peculiarities of the automobile to be searched. On the contrary, the exception was established because of the mobility of automobiles in general. *Carroll v United States*, 267 US 132, 153; 45 S Ct 280; 69 L Ed 543 (1925) (a ship, motorboat, wagon, or automobile is inherently different from a dwelling house); *Michigan v Thomas*, 458 US 259, 261; 102 S Ct 3079; 73 L Ed 2d 750 (1982) (application of the exception does not depend on the likelihood in each particular case that the automobile would have been driven away). Numerous evidentiary hearings would be required in the event that application of the automobile exception were based on fact rather than law. Further, evidence seized as a result of many reasonable searches would be suppressed if it were later discovered that at the time of the search the vehicle had a dead battery, flat tire, or some other mechanical problem that hindered its self-mobility.

The *Carter* Court further cited federal caselaw to support the assertion that "the justification to conduct a warrantless search under the automobile exception does not disappear merely because the car has been immobilized and impounded," nor "does it depend upon a reviewing court's assessment of the likelihood in each particular case that the car would have been driven away, or that its contents would have been tampered with, during the period required for the police to obtain a warrant." *Id*. at 516-518 (quotation marks and citations omitted).

This Court further detailed that the second basis for the automobile exception is the reduced expectation of privacy concerning automobiles. *Id*. at 517. "Automobiles, unlike homes, are subjected to pervasive and continuing governmental regulation and controls, including periodic inspection and licensing requirements." *Id*. at 418, quoting *South Dakota v Opperman*, 428 US

-7-

364, 368; 96 S Ct 3092; 49 L Ed 2d 1000 (1976). Furthermore, "The public is fully aware that it is accorded less privacy in its automobiles because of this compelling governmental need for regulation." *California v Carney*, 471 US 386, 392; 105 S Ct 2066; 85 L Ed 2d 406 (1985).

In the instant matter, although Holt was detained and unable to drive the rental vehicle, the automobile exception to the warrant requirement clearly permitted Sergeant Rodak to enter the vehicle. Given that Holt was suspected of killing a person with a firearm, the observation of a firearm inside the vehicle gives rise to probable cause to search the vehicle for evidence of the offense. The firearm was additionally in plain view, and as previously explained, subject to a warrantless seizure. Accordingly, the trial court properly denied Holt's motion to suppress the evidence recovered from his rental vehicle.

## IV. LATE ENDORSEMENT

Holt argues that the trial court allowing the late endorsement of the prosecution's witness constituted an abuse of discretion. We disagree.

"A trial court's decision to permit or deny the late endorsement of a witness is reviewed for an abuse of discretion." *People v Yost*, 278 Mich App 341, 379; 749 NW2d 753 (2008), 483 Mich 856 (2009). "A trial court abuses its discretion when its decision falls outside the range of reasonable and principled outcomes." *Id*.

MCL 767.40a(1) provides: "The prosecuting attorney shall attach to the filed information a list of all witnesses known to the prosecuting attorney who might be called at trial and all res gestae witnesses known to the prosecuting attorney or investigating law enforcement officers." To be timely, the prosecution must send the defendant or defense counsel a list of the witnesses it intends to produce 30 days before trial. MCL 767.40a(3). However, the prosecution "may add or delete from the list of witnesses he or she intends to call at trial at any time upon leave of the court and for good cause shown or by stipulation of the parties." MCL 767.40a(4).

Our Supreme Court has resolved that the prosecution's "only burden of production is to produce those witnesses it intends to call, a list that can be amended on good cause shown, *at any time*." *People v Burwick*, 450 Mich 281, 292; 537 NW2d 813 (1995) (emphasis in original). Late discovery or identification of a witness may constitute good cause. *People v Gadomski*, 232 Mich App 24, 36; 592 NW2d 75 (1998). "Mere negligence of the prosecutor is not the type of egregious case for which the extreme sanction of precluding relevant evidence is reserved." *People v Callon*, 256 Mich App 312, 328; 662 NW2d 501 (2003). "Moreover, to establish that the trial court abused its discretion, [a] defendant must demonstrate that the court's ruling resulted in prejudice." *Id*.

On the fourth day of trial, the prosecution moved to amend its witness list to add Peter Dunbar, an individual residing near the scene of the shooting. The prosecution contended:

> . . .Yesterday during the course of the testimony there was question that [defense counsel] had posed to Detective Williams about what his theory about what had occurred during the course of this homicide. Detective Williams responded that— with his version of events. Then [defense counsel] had asked Detective Williams where he got that version of events, what that was based off of and Detective

Williams referenced a witness whose name he could not produce yesterday on the stand.

He indicated, he being Detective Williams, indicated that this witness' [sic] statement was memorialized in his body cam, his being Detective Williams' [sic] body cam, which, in fact, was true.

I had mentioned yesterday when we were in chambers with the Court and [defense counsel] discussing possible jury instructions that if we were able to find the individual on his body cam video, which is four minutes in length, that I would be attempting to get him here to court today.

After further review of this individual his name is Peter Dunbar. The People checked their witness list and [] entirely as an oversight of the People I do not have that individual listed on my witness list. Mr. Dunbar's name did not appear on any paper reports which is what I base my witness list off of and inadvertently missed the body cam video.

The prosecution further argued that Detective Williams had relayed hearsay from a witness who had not yet been cross-examined by the defense, and the most effective means of presenting Dunbar's statements would be through his own testimony in court. The prosecution additionally stated that both it and defense counsel had reviewed the relevant body-worn camera footage of Dunbar's interview earlier that morning, and that this footage had been made available to both parties well before the day's proceedings.

Defense counsel confirmed that he had reviewed the body-worn camera footage alongside the prosecution and noted that the footage may have been part of the larger set of recordings he received in May during a visit to the Detroit Police Department. However, because of the poor audio qualify, identifying Dunbar by name in the footage was difficult. Defense counsel further asserted that the footage was not labeled, and Dunbar was neither identified nor referenced in any officer's report related to the case. Consequently, defense counsel did not have the opportunity to conduct an independent interview or investigation regarding Dunbar. Defense counsel additionally stated that although the prosecution provided access to speak with Dunbar that morning, the time allocated was insufficient to properly vet the witness, conduct a thorough investigation, or consult with Holt about the matter.

Following the parties' arguments, the trial court opined, "So the proposed individual, Mr. Dunbar, was identified and provided in a body cam worn video as part of discovery in this matter, the res gestae witness. This Court finds good cause to allow the People to amend their witness list to add this individual." Defense counsel then requested "a continuance to get an independent investigator to look into Mr. Dunbar and see what may have been on this video recording that I can't hear the audio to," which the trial court denied.

This Court has previously held that that there is good cause for the late endorsement of a witness by the prosecution when the witness was recently identified and found by the prosecution. *People v Canter*, 197 Mich App 550, 563; 496 NW2d 336 (1992). The trial court opted to credit the prosecution's explanation for why it neglected to provide notice until the fourth day of trial,

and it acknowledged that the evidence revealing Dunbar's identity was disclosed to defense counsel before trial. See *id*. at 561 (stating, "In light of our deference to the trial court's superior ability to evaluate credibility, we will not disturb [its credibility determinations]"). Furthermore, there was no indication that the prosecution's omission of the contested witness was intentional, and the prosecution immediately shared its finding concerning Dunbar with defense counsel. See *Callon*, 256 Mich App at 327 (opining, "The trial court did not abuse its discretion by finding 'good cause' for granting leave to the prosecutor to amend her notice of witnesses based on 'inadvertence' of the prosecutor to list . . . a witness critical to the prosecutor's case"). Ultimately, "An unprejudiced person considering the facts on which the trial court acted would be unable to say there was no justification or excuse for the ruling." *Id*. at 327-328.

Further, Holt has not demonstrated that he was prejudiced by the trial court's ruling. The prosecution informed defense counsel before Dunbar's testimony that it intended on reviewing the body-worn camera footage for Dunbar's statement, and both the prosecution and defense counsel watched the aforementioned footage before the fourth day of trial. The prosecution further provided defense counsel with the opportunity to speak directly to Dunbar before the initiation of the fourth day of the trial proceedings. Moreover, Dunbar's testimony was largely corroborated by other witnesses, who similarly stated that they heard gunshots and saw the perpetrator, a Black man dressed in all black clothing, subsequently flee in a gray SUV. Additionally, Dunbar's assertions regarding the trajectory of the vehicle, Holt's status as the sole occupant, and the perpetrator's possession of a firearm during the incident were substantiated by the admitted surveillance footage of the area, and the firearm recovered from the white Toyota RAV4 in Holt's possession. Defense counsel additionally subjected Dunbar to extensive cross-examination, and defense counsel challenged the validity of Dunbar's testimony in his closing arguments. Holt fails to indicate how a continuance would have altered the outcome of the proceedings, particularly in light of the extensive evidence against him, even excluding Dunbar's testimony. See *Burwick*, 450 Mich at 297 (stating, "Where, as here, there is no cognizable prejudice to defendant in allowing endorsement, excluding the testimony would convert the salutary purpose of discovery into a weapon against the truth-determining function of the trial process"). Because Holt did not establish prejudice, he is not entitled to relief.

## V. OTHER-ACTS EVIDENCE

Holt argues that the trial court improperly admitted two letters authored by him during his pretrial detention. We disagree.

"A trial court's decision to admit or exclude evidence is reviewed for an abuse of discretion[,]" and such decisions "will not be disturbed unless that decision falls 'outside the range of principled outcomes.' " *People v Thorpe*, 504 Mich 230, 251-252; 934 NW2d 693 (2019). "A decision on a close evidentiary question ordinarily cannot be an abuse of discretion." *Id*. at 252. A trial court necessarily abuses its discretion when it premises its decision on an error of law. *People v McFarlane*, 325 Mich App 507, 517; 926 NW2d 339 (2018). "This Court reviews de novo whether the trial court properly interpreted and applied the rules of evidence." *Id*.

Evidence of prior bad acts or offenses by a defendant must be excluded, except as permitted under MRE 404(b),[4] to avoid the danger of a conviction based on a defendant's mere history of misconduct. *People v Starr*, 457 Mich 490, 495; 577 NW2d 673 (1998). MRE 404(b)(1) states:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident when the same is material, whether such other crimes, wrongs, or acts are contemporaneous with, or prior or subsequent to the conduct at issue in the case.

This list is not exhaustive. *People v Sabin (After Remand)*, 463 Mich 43, 56; 614 NW2d 888 (2000). Moreover, evidence is not subject to exclusion under MRE 404(b) solely because it discloses a bad act, as bad acts may be independently relevant as substantive evidence. *People v Houston*, 261 Mich App 463, 468-469; 683 NW2d 192 (2004), aff'd 473 Mich 399 (2005).

In the instant matter, the prosecution moved to admit evidence of Holt's correspondence while he was in custody awaiting trial. The first letter written by Holt was addressed to a person identified as "G Man" at a residence in Detroit, Michigan, stating:

> We need as many people as you can get to come to my trial to see if we know any of the jury people. This is a calling all car's [sic] by any mean's [sic] at this point. Also I'mma ask you did we get a hit. Remember that! (If any of our people know any of the jury people). Destroy this after reading. Nesha got called down to be a jury holler at her.

The second letter was written to a "Lee Lee" at the same address providing:

> Lee Lee, when you get this. Call Nesha immediately and tell her this. Make sure you come down that day. It's for me. This can work out great. Also call around and ask if anybody else got [that] call as well. And tell them to come down (It's me G Baby). Remember when you come you have to be on point (you feel me) so it can work out. Let's get it.

Generally, to be admissible under MRE 404(b), other-acts evidence (1) must be offered for a proper purpose, i.e., to demonstrate something other than the defendant's propensity to commit the charged offense, (2) must be relevant to an issue or fact of consequence at trial, and (3) must not have a probative value substantially outweighed by its potential for unfair prejudice. *People v Watson*, 245 Mich App 572, 577; 629 NW2d 411 (2001). In this case, evidence of Holt's attempt to influence or intimidate the jury was admitted for the proper purpose of demonstrating his consciousness of guilt after the shooting, rather than as improper character evidence. See *People*

---

[4] The Michigan Rules of Evidence were substantially amended on September 20, 2023, effective January 1, 2024. See ADM File No. 2021-10, 512 Mich lxiii (2023). This opinion relies on the version of the rules in effect at the time this matter was decided.

*v Unger*, 278 Mich App 210, 227; 749 NW2d 272 (2008) (opining, "A jury may infer consciousness of guilt from evidence of lying or deception").

The letters in this case were also relevant. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401. Stated alternatively, to be relevant, evidence must be material, i.e., related to any fact that is of consequence to the case, and it must be probative, i.e., it must tend to make the existence of a fact of consequence more or less probable than it would be without the evidence. *Sabin*, 463 Mich at 57. In order to be material, the fact must only be " 'in issue' in the sense that it is within the range of litigated matters in controversy." *Id*. (quotation marks and citation omitted). In this case, evidence of Holt's efforts to improperly influence the jury was relevant to demonstrate his willingness to attempt to interfere in the prosecution of his offenses, and to establish that Holt acted as if he understood himself to be culpable for the charged acts. Similar to how a threatening remark may, in certain instances, "simply reflect the understandable exasperation of a person accused of a crime that the person did not commit," it is the jury's duty to determine the significance of such statements in conjunction with its consideration of the other evidence produced in the case. *Sholl*, 453 Mich at 740. Therefore, it was within the jury's province to assess the significance of Holt's statements, including whether the evidence indicated consciousness of guilt, or whether an alternative interpretation was warranted.

We recognize, even relevant evidence offered for a proper purpose may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." MRE 403. "However, evidence is not 'unfairly prejudicial' simply because it is damaging to a defendant's case." *People v Parrott*, 335 Mich App 648, 681; 968 NW2d 548 (2021). Rather, unfair prejudice "refers to the tendency of the proposed evidence to adversely affect the objecting party's position by injecting considerations extraneous to the merits of the lawsuit, e.g., the jury's bias, sympathy, anger, or shock." *People v Cameron*, 291 Mich App 599, 611; 806 NW2d 371 (2011) (quotation marks and citation omitted). "Evidence is unfairly prejudicial when . . . [the danger exists] that marginally probative evidence will be given undue or preemptive weight by the jury." *Id*. (alteration in original; quotation marks and citation omitted).

In this case, the probative value of Holt's letters was not substantially outweighed by unfair prejudice because the evidence is highly probative in that it reflects his consciousness of guilt, and the correspondence was not so outrageous as to evoke shock, bias, anger, or sympathy, or to be given undue weight by the jury, particularly in light of the overwhelming evidence presented against Holt. Moreover, the trial court provided the following limiting instruction to the jury:

> There has been evidence that the Defendant attempted to send correspondence while in custody. That correspondence has been introduced and it is your job to determine the weight and effect of the correspondence. This evidence does not prove guilt. A person may send correspondence for innocent reasons such as panic, mistake or fear.

-12-

However, a person may also send correspondence because of a consciousness of guilt. You must decide whether the evidence is true and if true whether it shows the Defendant had a guilty state of mind.

Additionally, while the jury submitted a question to the court during its deliberations regarding the jurors' safety considering the language in Holt's letters, the court reassured the jury of its safety and the trial court instructed the jurors to issue a verdict on the basis of the evidence presented. See *People v Abraham*, 256 Mich App 265, 279; 662 NW2d 836 (2003) (providing, "Jurors are presumed to follow their instructions, and instructions are presumed to cure most errors"). Accordingly, the trial court did not abuse its discretion by granting the prosecution's motion to admit the challenged evidence.

Affirmed.

/s/ James Robert Redford
/s/ Michael J. Riordan
/s/ Mariam S. Bazzi